WILLIAM J. BROWN and others, Trustees, *v.* MEETING STREET BAPTIST SOCIETY.

9　177
14　437

It is within the jurisdiction of the Supreme Court, under the full chancery powers conferred upon it by section 8, chapter 164, of the Revised Statutes, to sanction, in a proper case, the sale or exchange of real estate held upon trust for charitable uses.

When a grant is made upon a trust for charitable uses, the remedy, if the estate be misapplied, is not its forfeiture to the grantor or his heirs, but a proceeding on the equity side of the Supreme Court to enforce the trust, unless the trust is coupled with a condition that the estate shall revert if misapplied.

M. B. conveyed to O. B. and others, a certain lot of land in trust, for the purpose of erecting thereon a school house and a meeting house for the people of color in the town of P. forever. *Held,* that as the primary purpose of the donor was the promotion of the charity, the Supreme Court might disregard his incidental purpose, that the particular property given should be used for its promotion, and allow said lot of land to be sold or exchanged, if thereby the charity would be benefited.

The sale or exchange of such a trust estate, in such a case, is no violation of the implied contract on the part of the trustees that they will perform the trust, as the power of alienation is itself implied in the grant, and the trustees perform the trust by the proper exercise thereof.

THIS was an amicable bill in equity, brought by the complainants, trustees under the will of Moses Brown, against the respondents, the Meeting Street Baptist Society, for the purpose of effecting, through the aid of this court, the exchange of the lot of land held by the complainants in trust.

The bill in substance alleged, that Moses Brown, by his deed dated April 19, 1819, conveyed to Obadiah Brown and others, the lot on Meeting street, in the city of Providence, now sought to be exchanged, " *in trust for the purpose and use of erecting thereon, a suitable building for a School House on the Lancaster plan of education, and also for a Meeting House, for Divine Worship for the people of color, that now are, or hereafter may be in this town, and for no other use, but for the said people of color forever."* That further on in said deed appears this language—" *to be applied to and for the use of the people of color forever, for a School House and Meeting House, for them and their descendants and associates forever."* That the trust having become vacant by the death of

Brown and others, trustees, *v.* Meeting Street Baptist Society.

all the original trustees, this court under the provisions of Chapter 373 of the Statutes, on the application of the respondents, appointed the complainants, trustees to administer said trust. That the original trustees, and, after them, the present ones, have permitted all people of color in Providence, who choose to do so, to worship in the Meeting House on said trust property, and in 1855 the colored people who worshipped there, obtained an Act of Incorporation under the name of " The Meeting Street Baptist Society in Providence."

That, said meeting house being so greatly out of repair as to be nearly worthless, and the lot being very ineligible from its inaccessibility and surroundings, being entirely shut in by other buildings, the trustees pray for leave to exchange said lot for one much more eligible in every respect, said exchange being highly beneficial for the trust.

The defendant Corporation filed its answer, admitting the facts as alleged and joining in the prayer of said bill. Printed notice of the pendency of said bill was ordered by the court and given in a public newspaper published in Providence, notifying all parties interested, if any such there were, to appear and answer should they see fit so to do; but no one appeared in response thereto. The matter was referred to S. W. Peckham, Esq., as master to inquire whether the exchange prayed for was necessary and expedient, with leave to report any special matter. His report set forth that said exchange was necessary and expedient, and would be highly beneficial to the trust. The case came up for hearing on bill, answer, and master's report.

*Markland and Rogers for the complainants* :—

There can be no question but that Moses Brown's deed was a gift to charitable uses, it having been so decided by this court in the *Meeting Street Baptist Society*, v. *Hail*, 8 R. I. 234. Our statutes confer on this court the power to make the exchange prayed for, and an examination of all the legislation of this state relative to charitable donations will throw light upon the particular statute relied upon. Chap. 55 of the Revised Statutes, entitled, "Of Charitable Donations," Sec. 1, expressly recognizes any real or personal property, or the use, issues, or profits of any,

which have been or shall be given, limited, appointed and assigned by any person to and for the relief of the poor, or the bringing up of children to learning, or for any other specific purpose, as charitable donations, and gives town councils, in their respective towns, jurisdiction " to inquire of and concerning the same ; and of the abuses and breaches of trust, negligence, misemployment, not employing, concealing, defrauding, and misconverting or misgovernment thereof, as often as it shall appear requisite and needful," to make judgments and issue executions thereon, with an appeal to the Supreme Court.  The original act was passed in 1721, and continued in force substantially in the form in which it was originally adopted, down to the present time. The last section of the chapter was of later date.  Prior to the Constitution of 1842, our Supreme Court, or Supreme Judicial Court, as it was then called, had only the most limited equity jurisdiction conferred upon it, in a few specified classes of cases. That Constitution authorized the fullest equity powers, and accordingly, in the revision of 1844, we find the last section of the present chapter 55 added to the statute in regard to Charitable Donations, as follows, the word *chapter* alone being substituted for the word *act* in the revision of 1857 :  " Nothing in this act shall be construed to deprive the Supreme Court of original jurisdiction over any such matter as is by this act placed within the jurisdiction of town councils."  In other words the Supreme Court is authorized to exercise original and concurrent jurisdiction in all cases mentioned in Chap. 55.  Soon after the adoption of the Constitution of 1842, and in accordance with the authority contained therein, the Legislature conferred full equity powers on the Supreme Court, and the revision of 1857, in Chap. 164, sec. 8, continues the powers in the broadest possible manner, thus,—" The said court shall have exclusive cognizance and jurisdiction of all suits and proceedings whatsoever in equity, with full power to make and enforce all orders and decrees therein, and to issue all process therefor according to the course of equity."  In case the trust should become vacant, or cease to be administered, chapter 373 of the Statutes, passed in 1861, and which in its title is expressly declared to be an amend-

ment to chapter 55, empowers the Supreme Court to appoint new trustees " to administer the same according to the directions of the founder or founders thereof." This act, with Chap. 55 of the Revised Statutes, if the words, " or for any other specific purpose," in said last mentioned act have any signification, makes our legislation broader than the statute of 43 Eliz. In case the purpose prescribed by the donor of the charity could not be effectuated, chapter 625 of the Statutes, passed in 1866, empowers the Supreme Court to make a *cy-pres* application of the trust property. Thus far we see that the legislature has steadily gone on conferring upon the Supreme Court power after power relating to charities, which are exercised by the Chancery courts of England, though it might well be claimed that, in the exercise of full equity jurisdiction, our Supreme Court possessed the very powers conferred, thus making the work of the legislature, to some extent, at least, one of supererogation. Be that as it may, it only proves the intention of the legislature to give the Supreme Court the fullest power over charities and charitable estates. But while everything else was provided for by express statute that the Chancellor could do in England, there was still one omission. In England, Chancery can order the trust property sold when necessary or expedient, in the discretion of the court, and the proceeds reinvested upon the same trusts and to the same uses. Hill on Trustees, 462, and cases cited ; *Attorney General* v. *Warren*, 2 Swanst. 291 ; *Attorney General* v. *Hungerford* 8 Bligh. 457; *Attorney General* v. *Mayor, Aldermen, &c. of Newark upon Trent*, 1 Hare, 400 ; *Attorney General* v. *Nethercoat*, there cited. In 1867 our legislature passed " An Act to provide for a change of investment of Trust Estates," being Chap. 663 of the Statutes, which reads as follows :—" Section 1. Whenever the sale or conveyance of any trust estate shall have become necessary or expedient, and no provision shall have been made in the instrument in writing by which such trust was created, for such sale, the Supreme Court in its discretion upon a suit in equity, brought by a party interested therein, may decree such sale and conveyance, and the investment, reinvestment and application of the proceeds thereof, upon such security and in such

manner as shall best effect the objects of the trust, and be most safe and beneficial for all interested therein." The language is explicit and comprehensive, and includes " any trust estate."

A statute must be construed *secundum subjectum materiam*, which may limit general words. *In re, New South Meeting House in Boston*, 13 Allen, 517.

The language is broad enough to include charitable trusts— is there anything in the subject matter then, that avoids its applicability? On the contrary, it is submitted that, from the course of legislation in this State during the last ten years, this Act is the last link in the chain, which now gives to our Supreme Court by express legislative enactment, as full and ample powers in regard to charities as can be exercised in England by their Courts of Chancery.

It may be said, however, that by the language of the deed creating this trust, a condition is created, and that when it ceased to be used for a School House and Meeting House, the lot reverts to the heirs of Moses Brown.

All gifts to trustees whether by deed or devise are, in one sense, upon the conditions and for the uses named in the instrument creating the trust, yet chapter 663 will, in the discretion of the court substitute one estate for another, but subject to the same trusts; otherwise there could be no reinvestments which that chapter specially authorizes, when not authorized in the instrument creating the trust. Under our statute and under the law as decided in England, it will be necessary for a grantor who means to make a certain lot of land a perpetual monument of his charity, instead of a certain object, to insert an express provision that the land shall revert to his heirs when diverted from the use specified. The liberal spirit of the legislation of this age understands that donors mean the most substantial use of their gifts for the promotion of the charity specified, and not the mere fettering with a condition, a lot of land or other estates, that in the course of events may from its location or other cause become barren in all beneficial results to the charity that the donor had at heart. *Griffiths et al.* v. *Cope et al.* 17 Penn. St. 96 ; *Wells & Prince,* v. *Heath,* 10 Gray, 25.

Again, it may be urged that the trust created in the case at bar, is different from those where the rents, profits and income are alone used for the purpose of the trust. If the land is given for charitable uses it is difficult to see what difference in principle there is, or could be, in the *cestui que trusts* using the land themselves, or using the rents of the land leased to others. The result is the same, viz. : the gift to the *cestui que trusts* of rent of a certain lot of land forever for certain purposes. The enlightened spirit of equity, says, that the object in the heart of the donor was *charity*, and if the object specified failed, another was to be supplied, hence the *cy-pres* doctrine. We see, therefore, that not only may one estate be substituted for another, but unlike private trusts, the specific trusts or use itself may be changed, *cy-pres*. If this is the large and comprehensive scope of courts of equity, how can there be any question that chapter 663, applies to charities, when without it the court, as a court of equity, would have the power conferred, or rather confirmed by the statute. And this very power was exercised by the Supreme Court of Massachusetts, under a statute so similar, that the supposition is very strong that our chapter 663 was copied from it. See *Wells & Prince* v. *Heath*, 10 Gray 27, before referred to, where the court say, that this very power was exercised in relation to the trust estate then under litigation. See Chap. 100, Sec. 16, of the Gen. Stats. of Massachusetts, cited before the revision of 1860, as Statute 1846, 242.

But if, notwithstanding the plain scope of the statute, and the cases cited, particularly that from 10 Gray, 27, the court should doubt their power under Chap. 663, then it is urged that as a court of chancery, " having exclusive cognizance and jurisdiction of all suits and proceedings whatsoever in equity, with full power to make and enforce all orders and decrees therein, and to issue all process therefor according to the course of equity," the English cases above cited furnish sufficient authority for the exercise of the power claimed. See, also, *In re, Parke's Charity*, 12 Sim. 329 ; *In re, Alderman Newton's Charity*, 12 Jur. 1011 ; *In re, Suir Island Female Charity School*, 3 Jones and Latouche's Rep. 171 ; *Jackson* v. *Phillips et al.* 14 Allen,

549; *Thayer* v. *Smith*, 7 R. I. 164; *Rawson* v. *Inhabitants, &c.,* 7 Allen, 125; *Beatty & Ritchie* v. *Kurtz et al. Trustees*, 2 Pet. 566, 583; *Haddon et al.* v. *Chorn, &c.*, 8 B. Monroe, 70, 78; 2 Story's Eq. Juris. §§ 1165–1177; Hill on Trustees, (3d Am. Ed.) 191, 673–676. The authorities thus brought together show conclusively that there is nothing in the " *conditions,*" i. e., " *terms,*" or " *provisions,*" of Mr. Moses Brown's deed of gift, to prevent the court from authorizing the complainants to make the proposed exchange of this charity estate. The deed undoubtedly declares the purposes to which the land is to be applied; but this is nothing more than an indication of the particular charity to be benefited by the gift or anything different from what has occurred in the many cases cited by us, where the courts have authorized the alienation of the charity estates, or, when declining to do so for special reasons, have admitted the power of the court to direct a sale or an exchange, as the case might be. The point of attention in relation to the " *conditions* " or " *terms* " or " *provisions* " of this deed of trust is, that words contained either in ordinary grants, or trusts for public or charitable uses, declaring the purpose to or for which the granted premises shall be used or applied, without more, do not and cannot operate to render the grant conditional or the land inalienable, or to annex to the *estate* in the land any limitation, qualification, or resulting trust; and that when such words are used in gifts for charitable purposes *generally*, i. e., such as do not limit the gift to a particular institution or mode of application, instead of creating a bar to the alienation of the charity estates, or enabling the heirs-at-law to resume them, they have the very opposite effect and by pointing out the general nature of the charity, which is their sole office, furnish to the Chancellor, acting for the government as *parens patriæ*, in the usual and only known mode, the power, not possessed over ordinary grants or trusts of administering the property, to the exclusion of the heirs at-law, according to the principles of courts of chancery, as applied in such cases for centuries, that is to say, either by appropriating the property under the doctrine of approximation, technically called *cy-pres*, or by directing it to be sold, exchanged,

\* or leased in order that the charity, as that and that alone which the conditions make or could make perpetual, may by means of the rent, or purchase money, or the land to be taken in exchange, be carried on, according to the original scheme pointed out by the conditions, to better advantage in some other locality.

The report of the master settles beyond question that the exchange prayed for, is beneficial to the charity both in point of necessity and advantage; and the unanimity of the trustees, and of all interested in the administration of the trust, make this as strong a case for the exercise of the power prayed for, as could possibly be presented to a court of equity.

*Collins, for the respondents*, submitted the case upon the arguments of the complainants' counsel, preferring the willingness and desire of the respondents to have the transfer made, if, in the opinion of the court, it could lawfully be done.

The court, having directed that the Attorney General, *Willard Sayles, Esq.*, be made a party to the bill, notice was duly served upon him, and he filed his answer, stating that he was a stranger to the matters in complainants' bill contained, and claimed such rights and interests, for and on behalf of the state, as the court should be of opinion the state was justly entitled to. He further stated, in writing, that it appeared to him proper that the prayer of the bill should be granted, and that he did not desire to be heard, and had nothing to urge against it.

DURFEE, J. In this case the plaintiffs have submitted to us an argument upon two points relating, first, to the jurisdiction of the court, and second, to the question whether there is anything in the terms and provisions of the deed under which the plaintiffs hold, to prevent the proposed exchange.

1. There are several English cases in which the power of a court of chancery to sanction or direct an alienation of charity lands has been more or less distinctly recognized. *Attorney General* v. *Warren*, 2 Swanst. 291; *Attorney General* v. *Mayor of Newark*, 1 Hare, 395, 400; *Attorney General* v. *Kerr*, 2 Beav. 420; *Attorney General* v. *Hungerford*, 8 Bligh. 437; and Lord Plunket's judgment in the same, Ib. 463; *Attorney General* v. *Brettingham*, 3 Beav. 91; *In re, Suir Island Charity School*, 3

Jones & Lat. 171, and other English cases in which the power has been exercised, apparently without a question as to its existence ; *In re, Parke's Charity*, 12 Sim. 329 ; *Ex parte, The Overseers of the Poor of Ecclesall Brierlow*, 13 Eng. L. & Eq. 145 ; *Attorney General* v. *Biddulph*, 39 Eng. L. & Eq. 512 ; and see *Stanley*, v. *Colt*, 5 Wallace, (U. S.) 119.

We are satisfied, upon the authority of these cases, that it is within the jurisdiction of this court, under the full chancery powers conferred upon it by Sec. 8 Chap. 164 of the Revised Statutes, to sanction, in a proper case, the sale or exchange of real estate held upon trust for charitable uses. And see Dig. of 1844 p. p. 88, 89.

The counsel for the plaintiffs refers us to the Public Laws, Ch. 663, as conferring upon us the jurisdiction which they invoke, and to the case of *Wells & Prince* v. *Heath*, 10 Gray, 25, as showing that in Massachusetts a similar jurisdiction has been exercised, under a similar statute. We think, however, without denying that Chap. 603 may authorize the jurisdiction, that it previously existed under Chap. 164 § 8, with the benefit to the court of all the light which it can derive from the English precedents.

2. The lot sought to be exchanged is a lot which Moses Brown, by his deed dated April 19, 1819, conveyed to Obadiah Brown and others " in trust for the purpose and use of erecting thereon a suitable building for a school-house on the Lancaster plan of education, and also for a meeting-house for divine worship for the people of color, that now are or hereafter may be in this town, and for no other use but for the said people of color forever." And the grantor, further on in the deed, uses the following language : " And whereas one of the first public documents for a form of government to hold forth liberty of conscience, was, by two of my ancestors, first and early comers here, as appears in Hazard's State Papers, vol. 1, page 464, so I am desirous of promoting it in my native town, and in the meeting-house to be erected on the hereby granted lot of land purchased and hereby conveyed for that purpose." Again he uses the following language : " hereby conveying all may right, title," &c., " in said

lot of land," &c., " to be applied to and for the use of the people of color forever for a school house for them and their descendants and associates forever."

One question which has been discussed as arising on this lan·guage, or some of it, is, whether it does not amount to a condition annexed to the grant, so that the land, if alienated, will revert to the heirs of the grantor.

The cases cited on this point are against such a construction, where the only thing relied upon to show that the estate is con-ditional, is the fact that the grant purports to be made for the accomplishment of some purpose, not of private interest to the grantor, but public or general in its nature. In this case there is still another reason why, in the absence of any express con-dition, none should be implied. The grant is upon a *trust* for certain charitable uses, and, if the estate be misapplied, the fit-ting remedy is not its forfeiture to the grantor or his heirs, but a proceeding upon the equity side of the court to enforce the trust. *Barr* v. *Weld*, 24 Penn. St. 84; *Stanley* v. *Colt*, 5 Wal-lace, (U. S.) 119. We do not mean that such a trust may not be coupled with a condition that the estate shall revert if misap-plied, but that the court will not infer such a condition, where none such is expressed or necessarily implied. Agreeably to these views, we find that this estate is not upon a condition which will entitle the heirs of the grantor to re-enter for its alienation ; and of course the alienation, if made under the sanction of the court, will not be regarded as a violation of the trust.

But though the estate may not be conditional, the language of the deed shows that the grantor designed or expected that it should be used as the site whereon the proposed school-house or meeting-house should be built ; and it may be that the house was built by contributions given to some extent in view of this lan·guage. In consideration of this character of the grant, ought the court to sanction the exchange proposed ?

This is a consideration which appears to have been forcibly present to the mind of Sir James Wigram, in his remarks in the case of *Attorney General* v. *Mayor &c., of Newark*, 1 Hare, 395, 401 2, though even he does dot seem to have regarded it as con-

clusive that the power might not be exercised in a very special case. Indeed, the cases seem to rest upon the idea—somewhat like that which obtains in *cy-pres* applications of charity estates, —that the primary purpose of the donor being the promotion of the charity, his incidental purpose that the particular property given shall be used for its promotion, may be disregarded, and the property sold or exchanged, if thereby the charity will be greatly benefited. If this be the true view, we think we need not hesitate to give the sanction of the court to the exchange proposed; for however evident it may be that the donor designed or expected that the granted lot should be the seat of the contemplated charity, it is still more evident, from the scope and tenor of his deed, that it was the charity itself, and not the perpetual use of the lot for its advancement, which the benevolent donor had mainly at heart. If the gift had been apparently designed for some memorial or monumental purpose, we might come to a different conclusion; but we do not find in the deed, which appears to contain a very full exhibition of motives and feelings under which it was made, any indication of such a purpose; its leading, if not the sole object, appearing to be, the educational and religious improvement of the people of color, including those of Indian descent, in the town, now the city, of Providence, and in a way which would illustrate his hereditary regard for freedom of religious opinion.

Still one other question; does not the acceptance of the trust amount to an implied contract on the part of the trustees with the grantor, that they will perform the trust? and if so, can the court authorize or sanction an act which is in violation of such implied contract? The grant was made in 1819 before this court had the jurisdiction which is now invoked, and therefore it cannot be said that the grant was made subject to the jurisdiction; could the General Assembly, by an act passed subsequently to the grant, give the court power to authorize or sanction the alienation of the granted premises? would not such an act be a law impairing the obligation of a contract?

Assuming that there is an implied contract on the part of the trustees with the grantor, that they will perform the trust, the

answer is, that the power of alienation is itself a power implied in the grant ; and that the trustees, by its proper exercise, are performing the trust.

In the case of *Attorney General* v. *Warren*, 2 Swanst. 291, Sir T. Plumer, Vice Chancellor, says, *inter alia*—" The principle that governs all the cases is this, that the trustees are bound to a provident administration of the fund for the benefit of the charity ; there is no positive law, which says that in no instance there shall be an absolute alienation ; if so, even in the case of an inquiry under an order of the court, whether alienation would be beneficial to the charity, being contrary to law, it would not be good ; but on many occasions, by the authority of the court, alienation has taken place, as in the case mentioned of a decayed house, in which, after a reference to a master to in-quire whether it was for the benefit of the charity, the court directed it to be disposed of. If contrary to law, the court could not authorize the disposition ; alienation under the authority of the court would be as invalid as without it. These decisions, therefore, afford a conclusive proof that alienation, not improvi-dent, but beneficial to the charity, and conformable to the rule which ought to guide the trustees, may be good, and disclose the principles on which any bill to rescind that alienation must proceed."

The correct doctrine is, we suppose, that the trustees have the power, when the interest of the charity manifestly requires, to alienate the charity estate, and that the court is called upon to sanction the alienation, not because without such sanction the alienation may not be valid, but because without such sanction it is open to impeachment, and, also perhaps, that the trustees may have the benefit of the advice which the court, enlightened by its inquiries, can so properly afford.

This view is entirely consonant with the remarks of Lord Brougham, in the case of the *Attorney General* v. *Hungerford*, 8 Bligh. 437, to the effect that he could conceive a case where the trustees would not do their duty to the charity, if they did not alienate a part of the land, and where an information might, on principle, well be maintained against them to do that which

is for the benefit of the charity. In the case of the *Attorney General* v. *Hungerford*, a lease of charity lands renewable forever at a fixed rent, paying £25 for each renewal made by the trustees of the charity, was supported in the House of Lords.

We think, therefore, it is no infringement of the contract implied in the acceptance of the trust, for the trustees to alienate the estate, or for the court to sanction its alienation, in a proper case, for the reason that the charity being the principal, and the use of the land as its seat merely the incidental, purpose of the grant, the trustees have, by implication, the power to sell or exchange the land, if thereby the charity will be greatly benefited. Indeed, the question is, in another aspect, very much the same question which we have just answered, in deciding for the reasons given that the terms of the grant or trust were not such as to make it improper for the court to give its sanction to the proposed exchange. And see *Stanley* v. *Colt*, 5 Wallace, (U. S.) 119.

We are satisfied from the report of the master, that the charity as it now exists, will be very much benefited by the exchange proposed, and we therefore give it our sanction and approval, and authorize it to be made.

*Decree accordingly.*