CASE 79—MOTION—MAY 12.

# Hauns v. Central Kentucky Lunatic Asylum.

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION.

1. PRACTICE IN CIVIL CASES.—The levy of an execution will not be discharged on motion, upon the ground that the property was not liable to the levy.

2. CORPORATIONS PERFORMING PUBLIC FUNCTION—LIABILITY OF PROPERTY OF.—The mere fact that the processes of law may interfere with some of the functions of the State government is no reason why their enforcement can not be had; and the property of a corporation performing a function of government in caring for insane persons may be properly sold under execution if the sale thereof would not render it totally unable to properly care for the inmates; and the court judicially knows that "brick in kilns," "stock and fat hogs," "cattle" and "wheat in the shock," is such property as may be sold under execution without seriously interfering with the proper care of such inmates.

JOHN I. CALLOWAY, JOHN C. MILLER AND C. B. SEYMOUR FOR APPELLANT.

A. J. CARROLL, JOHN BARRET, A. S. BRANDEIS AND CARROLL & CARROLL FOR APPELLEE.

(Record and briefs not in the office.)

JUDGE GUFFY DELIVERED THE OPINION OF THE COURT.

It appears from this record that the appellee wrongfully constructed and maintained upon its premises two separate dams across Goose creek; that said two dams formed two separate artificial lakes on the premises of appellant, and that the maintenance of said lakes greatly diminishes the flow of said stream so that it is very sluggish. It further appears that the appellee built upon its land a sewer from said asylum which unites into said

stream below said lakes, and that through said sewer defendant discharges into Goose creek large quantities of kitchen slops, offal and refuse matter of every kind, and also the human excrement of all its inmates, servants and attendants, and as a result has greatly damaged appellant's farm, causing sickness and death in his family, and that he sued appellant and recovered judgment for $5,000 in damages.

It further appears that appellant on the third day of June, 1897, caused an execution to issue upon said judgment for the amount thereof, including interest and costs, directed to the sheriff of Jefferson county, which execution was by the sheriff, July 6, 1897, levied upon the following described property of the Central Kentucky Lunatic Asylum, to-wit.:

"Three head horses, thirteen head mules, work; three farm wagons, one dumb wagon, six carts, one two-horse spring wagon, three one-horse spring wagons, two one-horse surreys, one buggy, one binder, two mowers, four two-horse plows, three one-horse plows, three one-horse cultivators, six double shovels, one disk harrow, two two-horse harrows, one one-horse harrow, one potato plow, one sweet potato ridger, three sets buggy harness, three sets breech harness (six mules) four pair lead harness, five sets plow harness, two saddles, one wheat drill, one corn drill, one roller (iron), two hay rakes, two tempering wheels, brick yard, three lots of brick in broken kilns, one street car, one hundred and thirty-seven stock and fat hogs, fifty milk cows, two bulls, fourteen heifers, four veal calves,

seventy-five acres of wheat cut and in shock, —— acres of land sufficient to make the balance."

Which levy was afterwards amended as follows:

"The tract of land hereinabove levied upon is situated at Lakeland, in Jefferson county, Ky., and is the tract upon portions of which stand the buildings and other improvements of the Central Kentucky Asylum for the Insane, and the personal property so levied upon was found on said land."

On the 12th day of July, 1897, the appellee entered a motion to quash the execution aforesaid upon the ground that such execution was not the appropriate mode of enforcing satisfaction of the judgment. Appellee also moved to quash the levy aforesaid, because all of said personal and real property was held by the appellee for the benefit of the State of Kentucky, and for the care and maintenance of the insane persons committed to its care, and all is used for public purposes, and is necessary for the care and maintenance of said insane and for the purposes aforesaid, and none of said property, whether real or personal, was lawfully subject to be taken under execution against the estate of the appellee.

After the reading of affidavits in support of said motion, and after the reading of one affidavit in opposition to said motion, the court overruled the motion to quash the execution but sustained the motion to quash the levy, and rendered judgment quashing the levy, and from the judgment quashing the levy this appeal is prosecuted.

The contention of appellant is, first, that the court had no jurisdiction of the motion to quash the levy. In other

words, he maintains that a levy under execution can not be quashed upon simple notice and motion therefor, as has been done in this case.   It is further contended by appellant that even if the court had jurisdiction to hear and determine that question upon notice and motion, as in this case, yet the judgment appealed from is erroneous because the property levied on was in law subject to levy.

It is the contention of the appellee that the motion to quash the levy was an appropriate proceeding, and that the court had jurisdiction to enter the same, and that it was competent to read affidavits in support of the motion, and cites various decisions of courts of different States in support of its contention, and it may be conceded that some of the decisions tend to support the contention of appellee; but it, however, often happens that the statutes of the several States differ in regard to the rights and remedies in such cases, hence the decisions of courts other than those of Kentucky shed but little light, if any, upon the question under consideration.  We are, however, referred to the case of Chambers & Garvin v. Neal, 13 B. Mon., 256; and Hope v. Hollis, 5 Ky. Law Rep., 319, as sustaining the contention of appellee.

It will be seen from an examination of the case of Chambers & Garvin v. Neal that before the act of Congress establishing a system of bankruptcy Chambers & Garvin recovered a judgment in the Allen Circuit Court against Neal, and that in March, 1851, an execution was issued upon said judgment and levied upon two small tracts of land and one negro man.   And thereupon Neal gave notice to the plaintiffs in the execution that he would move the

judge of the Allen Circuit Court to quash said execution and levy upon the ground that he had been discharged from said demand by virtue of his certificate in bankruptcy. To this notice Chambers & Garvin appeared and filed a plea, alleging in general terms that the certificate of discharge was obtained by fraud. Neal demurred to the plea and the court adjudged the plea insufficient, and Chambers & Garvin failing to make further defense the court rendered judgment in favor of Neal, quashing the execution and levy; and from this decision Chambers & Garvin appealed.

The court said: "If the remedy by motion be an appropriate one, we are of opinion that the circuit court was right in sustaining the demurrer to the plea, and in giving judgment for the plaintiff in the motion.

"The plea is clearly insufficient because it does not specify the fraud intended to be relied upon, nor allege that prior reasonable notice had been given to Neal in writing, specifying the fraud or concealment intended to be relied upon. Such notice is required by the fourth section of the act of congress, and should have been alleged in the plea.

"An audita querela was the ancient remedy where the matter of discharge happened after the recovery of judgment, and the defendant was in execution or in danger thereof. But the practice now is, in such a case, to grant summary relief upon motion, which has rendered the remedy by audita querela useless, and driven it out of practice (3 Blackstone's Commentaries, 406). In a note on the same page Chief Justice Eyre is reported to have said:

'I take it to be the modern practice to interpose in a summary way, in all cases where the party would be entitled to relief on an audita querela.' The remedy, therefore, in this case was properly sought by motion."

It will be seen from the foregoing that the motion in the case supra was sustained because the defendant in execution had by appropriate legal proceedings been discharged from any liability to pay the judgment upon which the execution had been issued, and this being true the case supra is not authority upon the question under consideration.

The object sought in the case of Hope v. Hollis was to set aside an execution sale of property that was exempt as a homestead, which motion was sustained. The statute authorized a purchaser of real estate to recover such property when properly sold under an execution by motion, and it would, therefore, seem to follow by analogy that a party would be entitled to have a sale of his homestead set aside by a similar summary proceeding; and we fail to see that the last-named case has any bearing upon the case at bar.

We have examined with care the different provisions of the Code of Practice in regard to motions and summary proceedings, and the relief authorized to be obtained on motion, and fail to find any provision authorizing the action taken by the court in the case at bar. The only provision of the Code authorizing in any event a discharge and release of the levy under execution is to be found in subdivision 2 of section 650 of the Code, which authorizes the obligor, in the bond given under the provision of sec-

tion 648 on ten days' notice to the plaintiff in the execution, to move the court to which the bond is returned to discharge the same and release the levy under the execution.

It will also be seen that the Kentucky Statutes provides for relief by a motion in certain cases, but in none of them is it provided that the levy of the execution shall be discharged on motion upon the ground that the property was not liable to levy.

It is said, in section 271a in Freeman on Executions, volume 2, 2d edition, that "a motion to vacate a levy is not the proper proceeding to try questions of title to property, nor to determine whether property is subject to execution."

Section 1710 of the Kentucky Statutes provides that sales made under execution by fraud, covin or collusion may be set aside on motion of any person aggrieved.

The law provides ample protection and relief to a party whose property has been levied upon, or is about to be levied upon, if the same be not subject thereto. He may enjoin the levy and sale by a proper petition and execution of proper bond, or he may forbid the sale, in which event the sheriff will probably require an indemnifying bond from the plaintiff in the execution, which will be ample protection to the defendant; or if the sheriff fails to require a bond of indemnity, he will become liable upon his official bond for such damages as the defendant in the execution may sustain; and besides this, if the property be taken and the defendant desires to retain the specific property, he may by proper proceedings, under claim

and delivery, recover and hold the property until the question of liability to levy be determined according to law. It seems to us, in view of the statutory provisions and the reason and equities of the case, that the law did not authorize the court below to quash the levy under consideration herein, and that the judgment so quashing the same is and was erroneous.

Inasmuch as the liability of the property levied on herein to be sold under the execution in question has been argued at great length for both appellant and appellee, it may not be amiss to consider some of the questions touching the same.

It is the contention of the appellee that it is but an agency or arm of the State, and that the property levied on is the property of the State, devoted to the care and maintenance of the patients now or to be hereafter sent to the asylum, and that in no event can it be levied upon and sold.

It is the contention of the appellant that the appellee is a corporation created by the laws of the State, authorized to sue and to be sued, and that as such it in effect converted his farm to its own use, or what is practically the same thing, damaged it to the extent of $5,000 for the benefit and convenience of appellee; and furthermore, that the property levied upon was not necessary for the support of the inmates of the asylum, and that in any event, under article 13 of the Constitution of the State, as well as of the United States, appellee was bound to pay for the injury or taking of his property for public use.

Under our view of this case there is no competent evi-

dence before us as to whether or not the property levied on is necessary for the proper discharge of the duties incumbent upon the appellee under the laws of the State. Courts, however, take judicial notice of some facts, and also of the laws of the land. It seems from the several acts of the legislature that the appellee is in some sense a successor, or at least succeeded to some extent to the property of the State House of Reform for juvenile delinquents, which institution was created by an act of the general assembly, approved February 15, 1869. The act in question authorized the governor to appoint six commissioners for the purpose of selecting a suitable site and grounds on which the house of reform should be built, and the commissioners were authorized to purchase land, consisting of not less than 150 acres nor more than 300 acres, and they were also authorized to select suitable grounds for the erection of said house, and might take into consideration any proposition made to them, and of the performance of which satisfactory assurance was given to give or sell to the State the land necessary for the State House of Reform, or any part thereof. Various acts amendatory of the foregoing were enacted, until finally the institution became the Central Kentucky Asylum for the Insane, and as such, by the provisions of section 217 of the Kentucky Statutes, is authorized to sue and be sued, and is also invested with title to the property and rights of action now held by it.

It is provided in chapter 16, section 219, entitled "Charitable Institutions," that the commissioners of each institution shall elect one of their number president of the

board; that a majority shall constitute a quorum, but the
concurrence of a majority of all the board shall be nec-
essary for the allowance of any claim, or transaction of
any other business. . . . They shall have the general
management and control of all lands, buildings, funds,
books, papers, and other effects and property of their re-
spective institutions, and shall cause them to be used and
applied in the way best calculated in their judgment to
promote the objects for which the institution is establish-
ed.   They shall cause all State appropriations to be used
as directed by law, and all private donations and grants
to be sacredly applied to the purposes specified by the
grantors or donors, but the State reserves full control
over the institution, their officers and affairs.   They may
make such by-laws and regulations, not inconsistent with
law, as they may deem necessary for the government of
the institution, and of all officers and employes connected
therewith.

It is provided in section 222 that the superintendent and
board of commissioners shall, during the month of Octo-
ber in each year, make a report to the governor, showing
the condition of the institution under their charge, exhib-
its, amount of income and expenditures, and from what
source the income was received, and for what the expendi-
tures were made, the number of inmates received or dis-
charged or left during the year, with such other facts and
suggestions as they deem important, which report the gov-
ernor shall communicate to the legislature at its next
regular session.

Section 228 requires the treasurer, under order of the

board of commissioners, to receive from the treasurer
of the State all money appropriated. for the use of the in-
stitution, and receipt him therefor. It shall be his duty
to receive, collect, sue .for and pay out all moneys due and
belonging to the institution.

Section 231 provides that the steward shall have charge
of the farm and garden attached to the institution, and
shall have and control the cultivation and management of
the same, subject to the regulation of the board of com-
missioners. He shall within the first week, after entering
upon his duties, take and file with the commissioners a.
complete inventory of all crops on hand, live stock, farm-
ing utensils, vehicles, and all other effects properly per-
taining to the farm and garden, and shall preserve and be
responsible for those and all subsequent products of the
farm and garden, and all stock and effects that shall come
into his possession, and none of them shall be taken there-
from without the knowledge and consent of the superin-
tendent.

Section 232 provides that it shall be the duty of the stew-
ard to furnish for the institution such supplies from the
farm and garden as can be provided therefrom, and pre-
sent monthly to the secretary a written statement of the
kinds and amount and market value of all the supplies fur-
nished, verified by the officer through whose hands the
same passed. This statement shall be entered on the
books of the secretary and steward. No stock or produce
of the farm or garden shall be sold by the steward without
authority from the board of commissioners, and when
sales are made he shall pay and deliver the proceeds to

the treasurer, and take his receipt therefor, specifying what was sold, to whom and for what purpose.

It will be seen from the foregoing that the title to the asylum property is vested in the corporation, and that its agents or officers have charge and control of the property and products of the farm, and that they must make proper reports respecting such property and products, and that when a sale is made of anything they shall report the proceeds thereof. The products of the farm and garden lessen, of course, the amount of money which would otherwise have to be appropriated by the State for the care and maintenance of the inmates of the asylum. It will be seen that the appellee is authorized to sue and to be sued. It is manifest that if the appellant had committed a trespass upon the property of the appellee that it would have been entitled to have sued him and recover judgment therefor, and that an execution could have been levied upon his property, if he had any subject to execution; or in case of trespass he would have been liable to be imprisoned under a writ of capias ad satisfaciendum. Is it possible that appellant, whose property has been so greatly damaged and injured for the benefit of appellee, is authorized only to sue and recover a judgment, without any means of collecting or enforcing the same? But we are told that the appellee is an agent of the State, employed to discharge a charitable function undertaken by the State, and, therefore, appellant can not enforce the collection of his judgment by a sale of the property, the title of which is by the statute vested in the appellee, and the reason for this is said to be that if said property be sold it will les-

sen the income to be derived therefrom, and consequently require a further or greater appropriation from the State treasury to support the inmates. It seems to us that such reasoning is not well-founded. The title to this property is in the appellee, not in the State. It is true that the State requires the appellee to account for the proceeds of such as may be sold, and to furnish the products of the farm for the benefit of the asylum, such as may be needed, but it does not appear that if all of the products of the farm were taken and appropriated to the satisfaction of appellant's judgment that the inmates or objects of the State's bounty would thereby suffer.

We have been referred to many authoritites showing that the property of a municipal corporation charged with some governmental function or duties can not be sold under execution, if such property was necessary to enable it to discharge the duties incumbent upon it. The exemption of the State from a coercive process of the law has also been ably discussed, but in our opinion that doctrine has no application to the case at bar. The appellant is not seeking to interfere with a power of the State, nor sell its property. It may be true in a sense that a sale of the property in contest would affect the State, but that can in no sense affect the rights of the plaintiff to enforce the collection of his judgment. It is true that the appellee in a certain sense is dischaging a duty or function conferred upon it by the State—a duty which the State has assumed to perform or cause to be performed; but it will be seen from the foregoing that the appellee has had certain rights and certain obligations conferred and im-

posed upon it by the State which, in our opinion, must be performed, and its obligations enforced.

It is a well-settled rule of law that neither the State nor the United States can be sued without their consent, but it is also well settled that the mere fact that the process of law may interfere with some of the functions of the State, or the United States, constitute no reason why such enforcement can not be had.

The case of the United States v. Lee and Kaufman v. Lee, 106 U. S., 196, is a case in point. That was a suit instituted by Lee against Kaufman, Strong and others for the possession of a tract of land, alleged to belong to the plaintiff. It appeared that the property in question had been held for more than ten years by the United States, through its officers and agents on behalf of the government, with the control of the property and in the actual possession thereof, part of which was used as a military station and national cemetery. It was argued on behalf of the United States, as well as its officers, that the suit was in effect against the United States, and that no suit could be prosecuted against it, nor any judgment rendered that deprived the government of the use and occupation of the property, it being used as aforesaid for national purposes; but the Supreme Court, in a lengthy and well considered opinion, held that it was not in law a suit against the United States government, but a suit for the enforcement of a private right against persons in possession without right, and that plaintiff, having legal title to the property, was entitled to recover.

It seems to us that the case at bar is much stronger,

for here the title is really in the appellee, and the personal property levied on, in part at least, had been produced by the appellee, and the only obligation it was under was to account to the State for the same, and if it be taken in satisfaction of a judgment, unquestionably authorized by law, surely it could not be a misappropriation of the fund or property.

The case of Kemper, &c. v. City of Louisville, 14 Bush, 89, was an action in which Kemper sought to recover damages for injury to his property caused by certain street improvements done by order of the city of Louisville. The court in discussing the question said: "The right to compensation in this case is as clear as if the lot had been taken. Any injury to the property of an individual, which deprives the owner of the ordinary use of it, is equivalent to a taking, and entitles him to compensation. So a partial destruction or diminution of the value of the property by an act of the government which directly and not merely incidentally affects it is to that extent an appropriation. (Cooley's Constitutional Limitation, 3rd edition, page 545). In the case of Keasy v. City of Louisville, it is said: 'Private rights must be regarded. The public, like a private person, must so use its own as not to injure another's property. It can not take private property for public use without paying a just equivalent, nor can it disturb any personal right of enjoyment.'"

In Louisville Water Co. v. Hamilton, 81 Ky., 517, the court, in discussing the liability of the property of appellant for sale for taxes, said: "If the land claimed or owned by the company is not necessary to its operation, the chan-

Hauns v. Central Kentucky Lunatic Asylum.

cellor should direct the sheriff to sell it.  It will not be permitted to say that such accumulation of real estate so constituted such a portion of the entirety as will prevent a severance when not necessary to the operation of the franchise."

It may be conceded that it would not be lawful to levy and sell under the execution in question such property of the appellee as would render it totally unable to properly care for the inmates; but, as before stated, we are unable from this record to certainly determine as to all the property levied on by the sheriff.  It however, seems to us that the court judicially knows that the brick, the 137 fat and stock hogs, the fourteen heifers and the seventy-five acres of wheat, cut and in shock, might be sold without seriously interfering with the proper care of the inmates of the asylum.  In other words, such property is not indispensable to the support of the inmates.  As to the various other articles named, the importance of the appellee remaining in possession and control thereof would have to be determined by a court of competent jurisdiction upon presentation of the law and facts.

As before stated, the original amount of land authorized to be purchased is not to exceed 300 acres.  It is claimed in this case that the appellee now owns 550 acres. We can not undertake now to say whether or not that amount of land is indispensably necessary for the proper care of the patients in the asylum, nor do we deem it necessary to give an opinion upon that question.

A sale of land does not divest a party of possession, nei-

[37]

ther does it divest him of title, unless the land is subject to the levy and sale. If the appellant should elect to cause a sale of any portion of the land, he could only obtain possession by proceeding as the statute provides, in which event the question of the liability of the land to seizure and sale can be investigated and judicially determined, hence we do not feel inclined to express an opinion as to whether any portion of the land is liable to seizure and sale or not.

The justness and validity of appellant's judgment in this case is now beyond question, and it seems to us that it is the duty of the appellee to pay the same, and if portions of its property be taken and sold in satisfaction thereof that fact would be a sufficient voucher to entitle appellee in its settlement or account to the State to a credit therefor, or would be a sufficient account of the products of the farm or the property of the appellee seized and sold under the execution in question.

For the reasons indicated the judgment appealed from is reversed and cause remanded, with directions to dismiss the application and motion of appellee and for proceedings consistent herewith.

Judge Burnam dissents from so much of the opinion as holds that any of the property in question is liable to levy.