412 P.2d 259

STATE of Arizona ex rel. Samuel P. GODDARD, as Governor of the State of Arizona, Applicant,

v.

W. A. COERVER, Ruth C. Irving, William C. Smitherman, William B. McGrath, and Joseph E. McGarry, as Members of the Arizona State Hospital Board, Arizona State Hospital Board, the Board of Supervisors of Maricopa County, and Maricopa County, Respondents.

No. 8667.

Supreme Court of Arizona.

En Banc.

March 14, 1966.

138

Darrell F. Smith, Atty. Gen., Walter O. Holm, Asst. Atty. Gen., Phoenix, for applicant.

Robert K. Corbin, Maricopa County. Atty., John A. Golden, Deputy County Atty., Phoenix, for respondents Maricopa County and its Board of Supervisors.

Lewis, Roca, Scoville, Beauchamp & Linton, by Paul M. Roca, Phoenix, for respondents William A. Coerver, Ruth C. Irving, William C. Smitherman, William B. McGrath, and Joseph E. McGarry, as Members of the Arizona State Hospital Board and the Arizona State Hospital Board.

George Frederick Randolph, Phoenix, for Maricopa County Hospital Development Ass'n, amicus curiae.

LOCKWOOD, Justice:

Application for original jurisdiction in this Court was made by applicant, State of Arizona, ex rel. Samuel P. Goddard, as Governor of the State of Arizona, pursuant to the Arizona Constitution, Art. VI, § 5(1), A.R.S. We accepted the dispute, by order on July 6, 1965, stating the state's application for Writ of Prohibition would be treated as an application for Writ of Injunction against the named respondents.

The issues in this case concern the nature of the interest of the respective parties in certain lands conveyed in 1885 by deed from the Board of Supervisors of Maricopa County to the Directors of the Insane Asylum of Arizona, and the present power and authority of the successors of that grantee board to reconvey an unused portion of the lands to the original grantor.

On March 9, 1885, the Governor of the Territory of Arizona approved dual enactments of legislation entitled "An Act authorizing and instructing the Board of Supervisors of Maricopa County to issue bonds for a certain purpose," and "An Act to establish, maintain and provide for the government of an Insane Asylum." Ariz. Laws 1885, Nos. 53, 58. On September 8, 1885, acting pursuant to this legislative authority, the Board of Supervisors of Maricopa County purchased 160 acres of land from M. W. Kales and Charles H. Veil for the sum of $3500. On October 8, 1885, this same 160 acres was conveyed by the Board of Supervisors to the Board of Directors of the Insane Asylum of Arizona.

The deed upon which the applicant relies to prove its title is lengthy as it sets out a resolution adopted by the Territorial County. The deed, with omissions which are not material, reads as follows:

"This indenture made * * * by and between the County of Maricopa * *, and the Board of Supervisors thereof * · * * parties of the first part and the Directors of the Insane Asylum * * * parties of the second part * * ·*, Resolved, That a conveyance be made, executed and delivered to the Board of Directors of the Insane Asylum of Arizona with full covenants of warranty and further assurance by * * * the County * * * conveying unto the * * * Directors * * * *for the use and benefit of the Territory* of Arizona *and for said Asylum* * * *.

"Now therefore the said parties of the first part for and in consideration of the premises and of the acceptance of said land * * * and in order the more effectually to *carry out and fulfill the requirements and provisions of the said Acts of the Legislative Assembly* aforesaid have granted, bargained, sold, conveyed and confirmed and by these presents do grant, bargain, sell, convey and confirm unto the said parties of the second part and their successors and assigns all and singular that certain piece parcel and tract of land * * *. Together with all and singular the tenements hereditaments and appurtenances thereunto belonging or in anywise appertaining and the rents issues and profits thereof; and, also, all the estate right title interest, property possession as well in law as in equity and in possession as well as in expectancy of the said party of the first part of in or to

said premises and every part thereof with the appurtenances.

"To have and to hold all and singular the above mentioned * * * premises together with the appurtenances unto 'The Directors of the Insane Asylum of Arizona' * * * *for the use and benefit of the Territory* * * *, and for said asylum* in accordance with the provisions of the said acts of said Legislature; and the said parties of the first part and their successors and assigns the said premises in the quiet and peaceable possession of the said parties of the second part * * *, will forever warrant and defend; and said parties of the first part hereby covenant to make and execute all such further conveyances and to do and perform such further acts as may hereafter be deemed necessary in order to vest the title to the above mentioned * * * premises in fee simple absolute in the said parties of the second part their successors and assigns." (Emphasis supplied)

The respondents, W. A. Coerver, Ruth C. Irving, William C. Smitherman, William B. McGrath, and Joseph E. McGarry, are the duly appointed, qualified, and acting members of the Arizona State Hospital Board, and, as such, are the successors in office and in interest to the original Directors of the Insane Asylum of Arizona.

The land involved in this case constitutes slightly more than sixty-two acres of the land conveyed to the asylum board in 1885. The remaining portion of the original 160 acres is presently occupied and used by the Arizona State Hospital as the site of its physical plant and operation. During much of the time from its acquisition in 1885 until 1964, the land in question was used for agricultural purposes, in connection with the operation of the hospital.

On June 24, 1965, at a regular monthly meeting, the respondent Board unanimously adopted a resolution expressing its intention to convey to Maricopa County so much of the sixty-two plus acres as is needed for a new Maricopa County General Hospital. The present action was brought to test the power and authority of the State Hospital Board to convey the land and the power and authority of Maricopa County to accept the grant.

Both respondents contend the deed from the Board of Supervisors of Maricopa County to the Directors of the Insane Asylum created a charitable trust. The respondent Maricopa County contends the trust has failed, in part, and, therefore, the respondent Arizona State Hospital Board now holds the land as a resulting trustee for the benefit of Maricopa County. The respondent State Hospital Board claims it may substitute the res of the charitable trust. Applicant urges that the county holds no interest in the property, but that the state owns the land in fee simple absolute. Thus, the nature of the right, title or in-

terest conveyed by the deed of the land in question by the Board of Supervisors of Maricopa County on October 8, 1885, is the first question to be answered in resolving this case.

From the admittedly ambiguous instrument two major possibilities emerge: (1) a conveyance in fee simple absolute to the Directors of the Insane Asylum; (2) a conveyance of legal title in fee simple absolute to the Directors of the Insane Asylum and its successors to be held in trust for the use and benefit of the Territory of Arizona, and the people confined in the asylum.

A general principle of law applied to either a private or charitable trust, is that when a trust is created by a written instrument, the intention of the settlor is ascertained from the express language of the instrument, and court will not go outside the instrument in an attempt to give effect to what it conceives to have been the actual intent or motive of the settlor. If, however, the intention is not plainly expressed, or if the language used is ambiguous, there are well-established rules which courts will invoke to aid them in the construction of the instrument. See, Olivas v. Board of Nat. Missions of Presbyterian Church, 1 Ariz.App. 543, 405 P.2d 481 (1965).

One such rule is that the determination of the intention of the settlor, where construction is necessary, will be made in light of surrounding circumstances at the time of execution of the deed. The court places itself in the position of the settlor at the time of creation of the trust and interprets what he has said or done in light of his environment at that time. In the instant case the language used does not plainly express the intention of the grantor, and, therefore, it is necessary for us to look at circumstances surrounding the execution of the deed to determine if a trust was intended, and if so, the nature of any trust so created, its terms and its beneficiaries.

A charitable trust is defined as:

" * * * a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with property for a charitable purpose." Restatement, Trusts 2d § 348.

The settlor must manifest an intention to create a charitable trust. It is not necessary that any particular words or conduct be manifest to create a trust, and it is possible to create a trust without using the words "trust" or "trustee". Scott on Trusts §§ 24–25 (2d ed. 1956); Restatement, Trusts 2d § 24. Conversely, the mere fact these words are used, or other similar

words, does not necessarily indicate an intention to create a trust.

There is a difference of opinion in the reported cases as to whether language similar to that used in the deed in question passes legal and equitable title to the grantee in fee simple absolute or the legal title in fee simple absolute upon a trust with equitable title in the beneficiaries. We have found no Arizona cases which have interpreted language similar to that used in the deed in question. The language in the deed to the Board of Directors of the Insane Asylum of Arizona is clearly not precatory as it was not stated in terms of a "wish" or "desire".

Several courts have been presented with similar language in a deed or will and have found the existence of a fee simple *in trust*. See e. g., Harris v. Emmerling, 224 Ark. 40, 271 S.W.2d 618 (1954); City of Providence v. Payne, 47 R.I. 444, 134 A. 276 (1926); Kibbe v. City of Rochester, 57 F.2d 542 (W.D.N.Y.1932); Packard v. Old Colony R. R. Co., 168 Mass. 92, 46 N.E. 433 (1897); Hamlin v. "Perticuler Baptist Meeting House", 103 Me. 343, 69 A. 315 (1907); Schaeffer v. Newberry, 235 Minn. 282, 50 N.W.2d 477 (1951); Ramsey v. City of Brookfield, 361 Mo. 857, 237 S.W.2d 143 (1951); Greenleaf v. Land & Lumber Co., 146 N.C. 505, 60 S.E. 424 (1908); Abel v. Girard Trust Co., 365 Pa. 34, 73 A.2d 682 (1950). Other courts have found similar language did not create a fee

simple in trust. See, e. g., Armijo v. Town of Atrisco, 56 N.M. 2, 239 P.2d 535 (1951); DeKay v. Board of Education of Central School Dist., 20 Misc.2d 881, 189 N.Y.S.2d 105 (1959).

Thus, it becomes a question of interpretation of the language used in the light of all the circumstances.

The phrase "for the use and benefit of the Territory of Arizona and for said asylum" was twice used in the deed. Moreover, in Act 58 (Laws of 1885) which established the Insane Asylum, the Legislature provided, inter alia, that if not less than eighty acres of land were conveyed to the Board of Directors, "for the use and benefit of the Territory of Arizona and for said asylum * * *" then the Directors and their successors may receive and hold such property "for the benefit of the Territory of Arizona and the use of said Asylum." Certainly these phrases suggest an intention to create a charitable trust with the Board of Directors of the Insane Asylum as trustees, and the beneficiaries being the mentally ill of the state.

There is also language in the deed which might indicate that the intent of the County was to convey the land to the Board of Directors in fee simple absolute.

In the construction of an ambiguous deed, we look to the intention of the parties to a deed, if ascertainable from the entire instrument and resort to considera-

tion of attending circumstances to determine the estate conveyed. Pass v. Stephens, 22 Ariz. 461, 198 P. 712 (1921); Wise v. Watts, 239 F. 207, (9th Cir.) cert denied, 244 U.S. 661, 37 S.Ct. 745, 61 L.Ed. 1376 (1917); see generally Annot. 58 A.L.R.2d 1374 (1958). Moreover, since a deed must be construed as of the time it is given and not as of a later date, Palermo v. Allen, 91 Ariz. 57, 68, 369 P.2d 906, 914 (1962), we must delve into the applicable rules of construction of the period of 1885. The law then, as now, has treated the charitable trust with considerable favor, by applying liberal rules of construction in an effort to support such a trust. See Bogert, Trusts and Trustees § 368.

Though we have determined that the County had intended that the conveyance to the Board of Directors to be in the form of a charitable trust, we are still confronted with the task of determining whether the Board may dispose of land as per its resolution of June 24, 1965:

"NOW, THEREFORE, BE IT RESOLVED by the board of the Arizona State Hospital that a grant and conveyance be made to Maricopa County of so much of the 62.698 acres * * * as is needed for a new Maricopa County General Hospital on the express condition that the land transferred be used by Maricopa County for a County Hospital site, otherwise, to revert to the grantors, * * *."

The Restatement of Trusts 2d §§ 380(b) and 190(b) declare the applicable principle: "The trustee can properly sell trust property if * * * such sale is necessary or appropriate to enable the trustee to carry out the purposes of the trust * *." See also Bogert, Trusts & Trustees § 392 (1964).

Furthermore, the court will permit a trustee to deviate from the express terms of the trust if, owing to circumstances not known to the settlor or not anticipated by him, compliance would defeat or substantially impair the accomplishment of the purposes of the trust. Restatement Trusts 2d § 167. City of Wapakoneta Board of Education v. Unknown Heirs of Aughinbaugh, 99 Ohio App. 463, 134 N.E.2d 872 (1955).

It has long been stated that Courts of Equity will exercise their jurisdiction to sell property held for charitable purposes, where on account of changed conditions, the charity would fail, or its usefulness would be materially impaired without a sale. See, Grace Church v. Ange, 161 N.C. 314, 77 S.E. 239 (1913); Heustess v. Huntingdon College, 242 Ala. 272, 5 So.2d 777 (1942); Brown v. Meeting Street Baptist Society, 9 R.I. 177 (1869). This power to sell property held in charitable trust rests upon the equity court's power to effectuate the intention of the settlor. See Trustees of New Castle Common v. Gordy, 33 Del.Ch. 334, 93 A.2d 509, 40 A.L.R.2d 544 (1952);

Cf. Lowell v. Lowell, 29 Ariz. 138, 155–156, 240 P. 280, 286 (1925). It does not rest on the cy pres doctrine but rather on the inherent jurisdiction of the Equity Court. Scott on Trusts § 381; Restatement, Trusts 2d § 399 comment p; Henshaw v. Flenniken, 183 Tenn. 232, 191 S.W.2d 541, 168 A.L.R. 1010 (1946); Lovelace v. Marion Institute, 215 Ala. 271, 110 So. 381 (1926); Patton v. First Presby. Church, 129 S.C. 15, 123 S.E. 493 (1924); Holton v. Elliott, 193 N.C. 708, 138 S.E. 3 (1927). The South Carolina Supreme Court in Furman University v. McLeod, 238 S.C. 475, 491–492, 120 S.E.2d 865, 873 (1961) applied the appropriate rule:

> "The equities of the situation demand that this deviation from the technical terms of the trust, if it be a deviation, should be authorized by the Court.
>
> \*    \*    \*    \*    \*    \*
>
> "The defendant has raised the point that no deviation is possible since the *cy pres* doctrine is not recognized in South Carolina. It is the opinion of this Court, however, that the *cy pres* doctrine has no application in the instant case in any event as there is here no diversion of the trust and no transfer of assets to a different charity or to a different purpose.
>
> \*    \*    \*    \*    \*    \*
>
> "If anything, there is only a deviation from the strict or technical terms of the

trust to enable the same charitable institution to better fulfill the purposes for which it was organized and to carry out to the fullest extent possible, the intent and purposes of the grantors of the property in question." (Emphasis in original)

We do not find it necessary, at this time, to determine whether Arizona will apply the cy pres doctrine in an appropriate case.

■ Certainly the County and the Legislature had intended that agriculture be an essential element of the trust as they provided that sufficient irrigation be provided for the tract conveyed to the Board of Directors. Moreover, agriculture for a long period of time had supplied needed funds for the maintenance of the mental hospital, plus providing a method of treatment for the patients. However, in recent years the remaining land has been found to be useless for the farming purposes for which it was originally intended. Rehabilitative theories no longer support such activities as the most effective means of treatment of the mentally ill. 1959–1960 and 1963–1964 Annual Report of Arizona State Hospital. Also see Guttmacher, 37 F. R.D. 129 (1964); Rapaport, 37 F.R.D. 135 (1964). Moreover the economics of the situation do not support the future use of the land for agricultural purposes. See Annual Reports, supra.

Thus a conveyance to the County for the construction of a General Hospital would

greatly enhance the benefits to the beneficiaries of the charitable trust because the establishment of a modern well-equipped medical complex in the immediate vicinity of the Arizona State Hospital would beneficially consolidate community resources for diagnosis, care, and treatment of the mentally ill.

Therefore if the sale by the State Hospital Board is conditioned upon the use of the land for County Hospital purposes, it is obviously appropriate for supplementing the carrying out of the purposes of the original trust. If the sale were not so conditioned, so that the use of the land might be diverted to a purpose unconnected with hospital or medical care and treatment, it would be inconsistent at this time with the trust purposes, and therefore beyond the approved authority of the State Hospital Board.

It should be made clear that this Court does not have before it the question of the disposition of the lands, upon which the facilities or buildings are now being administered by the hospital board. Thus this decision does not purport to be future authority for the sale, transfer, or disposition in any manner of such hospital properties, as that question is not presently before the Court.

The state makes an extensive argument that the lands so conveyed to the Board of Directors of the Hospital vested in the State, and therefore only the State

Land Department would be authorized to convey such lands. See A.R.S. § 37–102. The State cites A.R.S. § 37–101, subsec. 13 which declares that state lands "means any land owned or held in trust, or otherwise, by the state * * *." Superficially this would appear to be a prohibition of sale by the trustee of a charitable trust when the trustee happened to be a governmental Board. If we were to assume that the State has legal title to such land, then such statute might be applicable. However, the legal title of the land conveyed by the County vested in the Board of Directors. The Act of 1885 stated that the land shall "be obtained by the Directors" and "remain under the control of said Directors." The legislative provision also provided that the land be conveyed to the said Board of Directors and their successors in office for the use and benefit of the Territory of Arizona for said Asylum. Thus it appears evident that the Legislature intended that the Board act as trustee of the property so conveyed.

It is generally held that a State Board may act in two entirely distinct and separate capacities and thus may hold title as trustee of a charitable trust. General Bd. of State Hospitals for the Insane v. Robertson, 115 Va. 527, 79 S.E. 1064 (1913); Hauns v. Central Kentucky Lunatic Asylum, 103 Ky. 562, 45 S.W. 890 (1898); State v. Evans, 33 S.C. 184, 11 S.E. 697 (1890). But see, State ex rel. Olsen v.

Montana Armory Board, 128 Mont. 344, 275 P.2d 652 (1954) (3–2 decision).

■ The question as to the power of the State Hospital Board to act as trustee of a charitable trust, was additionally recognized by the Legislature in 1964 when it gave to the Board the specific authority to accept and expend gifts and grants in trust. Laws 1964, Ch. 81. (A.R.S. § 36–204, subsec. B). Furthermore, a trustee which may have been incapable of administering a trust may do so upon subsequently receiving legislative authority. See, City of Providence v. Payne, 47 R.I. 444, 134 A. 276 (1926).

■ The fact that A.R.S. § 41–571.15 grants the State Planning & Building Commission the power to direct a sale of property belonging to the State or one of its institutions if such property is no longer useful, has no application here. Though the legal title had vested in the Board of Directors, the equitable title remained with those of the public to be benefited by the Mental Hospital.

■ Finally the fact that the Legislature has seen fit to sell a portion of State Hospital land on two occasions has no effect on the result reached herein. The sales to the City of Phoenix for a fire station (Laws 1953, Ch. 35) and roadway (Laws 1960, Ch. 46) were of benefit to the charitable trust. Such power or authority of the Legislature is in no way inconsistent with the conclusions expressed in this case. Such legislative power or authority is not exclusive of a broader power and authority of the court to administer the trust and to direct the conveyance. Bogert, Trusts & Trustees § 395; Scott on Trusts §§ 381, 399.5; Also see Trustees of New Castle Common v. Gordy, 33 Del.Ch. 334, 93 A.2d 509 (1952); Annot. 40 A.L.R.2d 544. But see, Bridgeport Public Library & Reading Room v. Burroughs Home, 85 Conn. 309, 82 A. 582 (1912).

Although the applicants for relief in this original proceeding designated it as an application for a writ of prohibition, this Court determined that it should properly be treated as an application for injunction, and accepted jurisdiction.

For the foregoing reasons, the writ of injunction is denied.

STRUCKMEYER, C. J., BERNSTEIN, V. C. J., and McFARLAND, J., concur.

UDALL, Justice (dissenting).

I cannot agree with the reasoning or conclusion reached by the majority of this Court and therefore respectfully dissent. The original deed, the Constitution of this State, and the manner in which the parties have dealt with the land over the past 80 years, leads me to conclude the land involved is held by the state in fee simple absolute. For eight decades the Arizona

Legislature has exercised absolute control and dominion over the land on which the State Hospital is located and there has never been a suggestion that any other agency had any authority to convey a portion of the land. As a result of the majority opinion the elected legislature is placed in a subservient, inferior position to the appointed State Hospital Board when dealing with the hospital land.

The factual situation set out in their opinion is essentially correct but does not mention certain matters which have a bearing upon the problem and therefore are discussed in this dissent. The majority opinion holds that the deed was a conveyance of legal title in fee simple absolute to the Board of Directors of the Insane Asylum and its successors to be held in trust for the use and benefit of the Territory of Arizona. Incident to this holding is that members of the present State Hospital Board, as trustees, have the power to convey any excess land for purposes consistent with the original trust, and, also, that the legislature has the power to convey the land of the charitable trust. This result is patently inconsistent with the law and contrary to long established treatment of the subject matter in question.

I disagree with that portion of the majority opinion which states "the sale by the State Hospital Board is conditioned upon the use of the land for County Hospital purposes * * *" in that a sale is not involved in this case. Instead, we are concerned with a possible gift deed in fee simple determinable with a possibility of reverter. There was absolutely no consideration demanded by the State Hospital Board as shown by their resolution of June 24, 1965, which stated:

"NOW, THEREFORE, BE IT RESOLVED by the board of the Arizona State Hospital that a grant and conveyance be made to Maricopa County of so much of the 62.698 acres (described in the survey of February 23, 1965, prepared by Holmquist Engineers, Inc.) as is needed for a new Maricopa County General Hospital on the express condition that the land transferred be used by Maricopa County for a County Hospital site, otherwise, to revert to the grantors, and

"BE IT FURTHER RESOLVED that said transfer or conveyance be *without any consideration, condition or agreement* concerning exchange of hospital services to institutional patients at Arizona State Hospital *in return for the land * * *.*" [Emphasis added].

The only requirement necessary for exchange of the State Hospital land was, as expressed in a resolution by the Board of Supervisors on June 28, 1965, that such a transfer would mutually benefit both hospitals, and a statement of policy as to future plans in regard to programs and training

which can hardly be considered sufficient consideration for the valuable state land. How such a gift of the land without consideration could benefit the charitable trust or be advantageous to the mentally ill of this state is not stated.

The Board of Supervisors of Maricopa County adopted a resolution on June 21, 1965 wherein they expressly refused to render medical care to patients of the Arizona State Hospital and requested the land be conveyed to the county without payment of any consideration. It is apparent there was no sale involved as there is no obligation on the part of the County to render medical services to the State Hospital patients or give any other consideration to the Board for the land. Furthermore, the mentally ill of the State Hospital could only be treated at a County Hospital located nearby if the legislature authorized the payment of the expense for such treatment.

In addition to the above, the State Hospital Board acting as trustee sought to deviate from the alleged charitable trust without first obtaining the permission of any court. The Board adopted the resolution seeking to convey the 62 acres without prior court approval and the applicant had to contest the validity of such act by the State Hospital Board in this Court. To permit the State Hospital Board to have the sole power to determine what part of the land originally acquired is no longer needed is an unwarranted infringement upon the legislative authority of this state. It is a wide stretch of power for the Board, if it is the trustee of a charitable trust, to conclude ex parte that they can make a gift of the State Hospital land to Maricopa County upon which to build a hospital. See Restatement, Trusts 2d, § 167. Absent consideration the resolution of intent to convey the land cannot legally be interpreted a sale, but must be a resolution intending a gift deed. In Re McDonnell's Estate, 65 Ariz. 248, 179 P.2d 238; Kline v. Kline, 14 Ariz. 369, 128 P. 805. While it may be proper for a trustee to sell excess property with court approval in some instances, it is ordinarily improper for the trustee to make a gift of trust property without some benefit to the trust. Restatement, Trusts 2d § 190 (n).

Perhaps the most serious defect in the majority opinion is the potential danger created by the opinion as to future use of the State Hospital site. For more than 80 years the legislature has been appropriating and spending state tax funds to build, maintain and operate the hospital. The result reached by the majority of this Court will harness the legislature to a course of conduct where they expend state tax funds on land which may be disposed of by an appointed board with court approval, or that may one day revert to the county if the State Hospital is moved from its present location. The immediate solution may be expedient but in the future may create ir-

reparable harm and could require the State Hospital to perpetually remain at its present site. Otherwise, unless the sale of the entire tract of land can be considered for charitable purposes, the legislature could not relocate the hospital by selling the land and using the proceeds to acquire a site elsewhere in the state. The final result of this matter may harm the very class of persons the original conveyance intended to benefit.

The fallacious reasoning of the majority opinion is clearly demonstrated by their reliance upon A.R.S. § 36–204, subsec. B (1964), and their conclusion that if the State Hospital Board did not have power to act as trustee of a charitable trust in 1885 they acquired this power in 1964. This later date was when the legislature gave the State Hospital Board the power to accept and expend gifts held in trust. Surely, if the State Hospital Board did not have such power before, their predecessors could not have accepted the land in trust in 1885.

The 1964 legislation was the first expression by the legislature that the State Hospital Board could hold private property for uses distinct and independent of public uses. Therefore, the conveyance to the Board in 1885 must be considered for state purposes and they do not own such property in any proprietary sense. The conveyance to the Board formally vested title in the state. See, State ex rel. Olsen v. Montana Armory Board, 128 Mont. 344, 275 P.2d 652; Harris v. Emmerling, 224 Ark. 40, 271 S.W.

2d 618; Mississippi Valley Trust v. Ruhland, 359 Mo. 616, 222 S.W.2d 750; Brash v. State Tuberculosis Board, 124 Fla. 167, 167 So. 827. "A state board empowered to take and hold the title to property for state purposes does not own such property in any proprietary sense. It is state property, to all intents and purposes, the same as where title thereto is formally vested in the state." 49 Am.Jur. States, § 56, p. 269.

There is no support in the laws of this state to fortify the position taken by the Court today. The administration of the land of the State Hospital logically belongs to the legislature as elected representatives of the people instead of sharing this responsibility with the appointed State Hospital Board. The legislature has experience, knowledge and skill, plus the necessary facts and information to project and implement an over-all comprehensive plan to care for the mentally ill of this state. Yet, because of the result of this case the legislature does not have exclusive control and ownership over the land upon which the State Hospital is located.

The majority opinion states the "legislative power or authority is not exclusive of a broader power and authority of the court to administer the trust and to direct the conveyance * * *." This statement places the legislature in a secondary position to the State Hospital Board when dealing with the land which was never intended by the original conveyance or subsequent legislative

acts in this state. If the State Hospital Board through the courts has a broader power then there can be no question that the legislature can only act in a narrower field. See, e.g., Re Opinion of Justices, 237 Mass. 613, 131 N.E. 31.

The conclusion the title to the land is in the state is fortified by subsequent acts of all parties involved. In 1953, the legislature empowered the governor to execute in the name and on behalf of the state a quitclaim deed of a portion of the original land grant to the city of Phoenix for a fire station site. Chap. 35, Laws 1953. In 1960, the governor was empowered and directed to convey to the city of Phoenix for roadway purposes another portion of the state hospital land. Both of these grants clearly demonstrate the legislative belief that it had exclusive control over the land in question and that the state held the property in fee simple absolute.

In explanation of these conveyances by the legislature the majority opinion states the legislature has concurrent power with the State Hospital Board over the alleged charitable trust and that both bodies may act independent of the other as long as the object of such action is connected with the purpose of the original trust. This theory has little support in law as historically the power to control administration of charitable trusts rests with the courts. IV Scott, § 399.5 (1956). There is no precedent in Arizona for legislative authority over the administration of charitable trusts and infringement upon the long-exercised power of the courts of equity to permit the sale of land in an established trust where the purpose has failed. The reasons for this rule is the fundamental doctrine of separation of powers and basic principles of common law.

The majority opinion finds the phrase "for the use and benefit of the Territory of Arizona and for said asylum" which was used twice in the deed and once in Act 58, Laws, 1885, shows "an intention to create a charitable trust with the Board of Directors of the Insane Asylum as trustees, and the beneficiaries being the mentally ill of the state." Without additional indicia of intent demonstrated from the deed or other sources, I cannot follow such a conclusion merely derived from the use of the phrase "for the use and benefit."

This is particularly true when the entire instrument is read and other language is compared with that phrase. The better analysis and conclusion would appear to be the state has title to the property in fee simple absolute and the State Hospital Board has no authority to convey the land in question. The following discussion is suggested as the proper solution to this problem.

The actual language in the deed indicates the intent of the County was to convey the land to the Board of Directors in fee simple absolute. Such phrases as (1) "full covenants of warranty and further assurance",

(2) "in consideration," (3) "all the estate right title interest, property possession as well in law as in equity," (4) "in possession as well as in expectancy," (5) "quiet and peaceable possession," (6) "forever warrant and defend", (7) "covenant * * * to execute all such further conveyances," and (8) "fee simple absolute" would seem to manifest an intent to convey the property in fee simple and not establish a trust. The usual rule is, when there is an ambiguity in a deed between parties, a method of construction more favorable to the grantee will be selected, reasoning that since the grant is expressed in the words of the grantor, it is an expression of his intention, and he is therefore chargeable with the language used. In the instant case, the use of the phrase "for the use and benefit of the Territory of Arizona" does not, when the entire instrument and surrounding circumstances are considered, appear to manifest an intent to create a charitable trust.

The 1885 legislation creating the asylum and commanding the territorial county to buy the land does not point to the creation of a charitable trust. Section 1 of Act No. 58, Laws 1885, provides the land be "donated" to the Board of Directors. This, of course, points to a gift of the land. Section 4 of the same Act states, "that the cost shall not exceed, when completed, the sum of seventy-five thousand dollars, including the purchase price of said lands, which shall have been purchased by said Board." The Board of Directors was commanded to receive suitable land by the word "shall" in section 4, and no discretion was given in the matter. A command to receive necessary land by way of purchase or gift is not consonant with receiving land from a trustor who may attach conditions.

To insure the creation of the asylum the legislature commanded the County to purchase land "acceptable to" the Board of Directors. The County would have to be assured of the acceptability of the land before they purchased it. The County would appear to have been acting as the agent of the territory in purchasing the land as it was "instructed" to purchase acceptable land. In making the requirement that the County levy a direct property tax to achieve the purchase of the land, the legislature said " * * * it shall be their duty, and they are hereby directed," and thus the County was not acting freely as a settlor of a charitable trust usually acts.

In addition, Section 1 of Act 58 (1885) contained a proviso "that said County of Maricopa * * * shall first have conveyed, or cause to be conveyed" to the Board of Directors of the Insane Asylum, "not less than eighty acres of land * * * free from all incumbrances * * *." Once again this wording is not consistent with the creation of a trust. To subject the land to a charitable trust would no doubt encumber the land and would be contrary to the wording of the legislative act. An

examination of this matter, in light of Acts 53 and 58 (1885) reveals no authority for the Board of Supervisors to make the type of conveyance they now assert.

The fact the territorial county was required by Section 2, Act No. 53, 1885, to sell its bonds payable in 1900 in the amount of $3500, is not significant, since in 1891 the territory assumed all County bonded indebtedness existing as of December 31, 1890. The Asylum bonds were outstanding on December 31, 1890, and the United States had provided that the territory could enact such a debt refunding act. 26 Stat. 175, Ch. 614. See Utter v. Franklin, 172 U.S. 416, 19 S.Ct. 183, 43 L.Ed. 498 (1899). As a result of this Act, a private person had a right to exchange his County bond for a territorial bond without regard to the wishes of the County. Yavapai County v. McCord, 6 Ariz. 423, 59 P. 99 (1899).

It would, also, appear the territorial legislature could impose on a county a liability for a territorial purpose and require a county to raise money by bonding for territorial governmental purpose. The legislature was not limited by requirements of uniformity in levying direct taxes. Territory v. Connell, 2 Ariz. 339, 16 P. 209 (1888). The territorial legislature in 1885 passed many Acts requiring various counties to pay for territorial public benefits. See, Acts Nos. 3, 47, 64, 78, 81, 114 and 116, Laws of 1885.

In 1862, Congress passed an Act which provided, "it shall not be lawful for any corporation or association for religious or charitable purposes to acquire or hold real estate in any Territory of the United States during the existence of the territorial government of a greater value than fifty thousand dollars; * * *." 12 Stat. 501, Ch. CXXVI, Sec. 3. Section 4 of the Asylum Act, however, envisages the purchase or holding of property at the inception of the operation of the Asylum which would have a value of seventy-five thousand dollars. The territorial legislature, no doubt, was aware of the Congressional Act, and did not intend to create a charitable trust completely beyond the purview of the legislature.

Also, in 1878, Congress passed an Act which prohibited territories or political subdivisions thereof from engaging in proprietary activities and required these bodies to confine their expenditures to purposes that forward governmental activities only. 20 Stat. 101, Ch. 168. The Congressional limitation was interpreted and applied in Lewis v. Pima County, 155 U.S. 54, 15 S.Ct. 22, 39 L.Ed. 67 (1894). It would appear that the Territorial County had no power to grant land to a trust completely beyond the control of the territorial legislature. Also, there was no specific authority from Chapter IX, Compiled Laws 1877, for the Board of Supervisors of counties to convey property to charitable trusts. It would appear, for the aforementioned reasons, the Board of Supervisors of Maricopa County did not

intend and had no authority to convey the land in trust.

If the deed conveyed the property to the Directors of the Insane Aslyum in fee simple absolute, does the present State Hospital Board have authority to convey part of the land to Maricopa County? The Act to establish, maintain and provide for an insane asylum and which provided for a Board of Directors did not expressly provide that the Board had power to convey any excess land. It is my opinion the land became part of the res of a trust created by the Constitution of Arizona. The United States by the Enabling Act, conveyed 100,000 acres of land to the State of Arizona in trust for the use of insane asylums. Enabling Act, § 25, A.R.S. Vol. 1, p. 87. The terms of the trust contained in the Enabling Act were confirmed by the State of Arizona in Article 10, § 1 of the Arizona Constitution.

The Constitution settled an additional trust upon the state for the same objects contained in the Enabling Act. The res of this trust was "all lands otherwise acquired by the State" as described in Article 10, § 1 of the Constitution which provides:

> "All lands expressly transferred and confirmed to the State by the provisions of the Enabling Act approved June 20, 1910, including all lands granted to the State and all lands heretofore granted to the Territory of Arizona, and all lands otherwise acquired by the State, shall be by the State accepted and held in trust to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this Constitution provided, and for the several objects specified in the respective granting and confirmatory provisions. The natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same."

In Murphy v. State, 65 Ariz. 338, 362, 181 P.2d 336, 352 (1947) referring to the phrase "and all lands otherwise acquired by the state," we said

> "The phrase 'and all lands otherwise acquired by the state' appearing in sections 1 and 9 of article 10 of the Constitution are not all inclusive. These words 'and all lands otherwise acquired by the state' refer to lands otherwise acquired by the state for the uses and benefits of the trust which was set up to create permanent funds for the support and maintenance of the institutions referred to in the Enabling Act. It is a matter of common knowledge that, since admission into the Union, the state has acquired much property for governmental purposes and for proprietary uses."

This clause not only refers to land "otherwise acquired" by the State after statehood, but, also, to land "otherwise acquired" by the State as a territory before 1912.

The Constitution states that where the word "territory" occurs in laws of the ter-

**154**

ritory still in force, the word "state" shall be substituted. Art. 22, § 2, Arizona Constitution. Thus, "land otherwise acquired by the state" does not depend on the date of statehood. If the framers of the constitution meant otherwise, they would have used the phrase "land otherwise to be acquired by the state." The framers of the constitution knew that many institutional lands had not been conveyed to the territory by the United States. See e. g., Compiled Laws, 1877 [1162] § 6 and [1166] §. 10; Revised Statutes 1887, § 2515; Laws 1893, Act 81, §§ 3, 4 and 5; Laws 1897, Act 25, § 2. There is no other reference except in Article 10 to these institutional lands separate and distinct from reference to constitutional lands granted by the Enabling Act in the Constitution. It is a reasonable inference that the framers of the Constitution did not intend the state to hold institutional lands otherwise acquired by the territory in a different manner from institutional lands granted to the territory by the United States in the Enabling Act.

For the reasons set forth in this dissent, I would make permanent the writ of injunction enjoining the State Hospital Board from conveying the sixty-two acres, since the land comes within the provisions of Article 10, § 1 of the Arizona Constitution, and find that Maricopa County has no interest in the land since the conveyance did not create a charitable trust.