174 Ariz. 228 (1992)
848 P.2d 313
In the Matter of the ESTATE OF Robert Wallace CRAIG, deceased.
ST. JOSEPH'S HOSPITAL AND MEDICAL CENTER, Petitioner-Appellee, Cross Appellant,
v.
Michael Ray HANSGEN; Gary Alan Hansgen; Mrs. Darrell L. Hansgen; Patricia Lynn Hansgen; Douglas Wayne Hansgen; Debra Ann Hansgen; Lyle Puzey; Mrs. Patsey Puzey; Mrs. Herschel Abbott; Mrs. Byron Wolfe; Misti Sue Wolfe; Staci Dean Wolfe; Glen Lowell Puzey; Nathan Puzey; Mrs. Lynn Fay Efird; Charles Maney Cork; Manley J. Cork; Timothy Van Puzey; Jay Charles Puzey; Kevin Jay Cork; Brian Lee Cork; Robert Mason Davis; Gene Alkire Davis; Rev. Michael Jay Davis; Mrs. Marion A. Wright; Fredrick McLean Wright; Marion Eugene Wright; Mrs. Karen Wright Bireline; Leona Heischmann Kuchefski; Robert W. Craig; Harold E. Craig; Vern Ingalsbe; C. Diane Cannon Lane; Larry J. Cannon; Steven A. Cannon; Michael J. Cannon; Richard L. Cannon; Win Smith; Harold A. Craig; Dennis Lee Wright; Stephen J. Kuchefski; Mrs. Claudia Kuchefski Ohl; and all heirs of Robert Wallace Craig, deceased, Respondents-Appellants, Cross Appellees.
No. 1 CA-CV 90-300.
Court of Appeals of Arizona, Division 1, Department E.
September 24, 1992.
Review Denied April 13, 1993.
*230 Garrey & Curran, P.C. by D. Reid Garrey, James P. Curran and Shawna Woner, Phoenix, for respondents-appellants, cross appellees.
Jennings, Strouss & Salmon by James M. Ackerman, John B. Weldon, Jr. and David J. Estes, Phoenix, for petitioner-appellee, cross appellant.
*231 OPINION
VOSS, Judge.
In this appeal we must construe a testamentary trust written in 1930. Since the time of the testator's death circumstances have changed substantially so that the terms of the charitable trust are outmoded. The heirs of the testator ask us to hold that the trust has failed and the estate should be distributed to them. The beneficiary of the trust requests that we deviate from the terms of the trust by application of the doctrines of cy pres or equitable deviation.
FACTS AND PROCEDURAL HISTORY
Dr. Robert Wallace Craig was a physician who came to Arizona in 1898 suffering from tuberculosis. He conquered his tuberculosis and went on to become a prominent physician, businessman, and property owner in Phoenix. Dr. Craig died in 1933, leaving a will dated May 12, 1930. He was survived by his wife and daughter.
In his will, Dr. Craig established a trust for the benefit of his wife and daughter, to provide them income for life. Dr. Craig's wife died in 1976 and his daughter died in 1987. Dr. Craig also provided for disposition of the trust estate following the death of his wife and daughter. Dr. Craig set out his intentions in "Article Fifth" of his will:
FIFTH: Upon the death of the survivor of my said wife and my said daughter, there shall be turned over and delivered from the trust estate to Sisters of Mercy of Arizona, a corporation, conducting St. Joseph's Hospital in Phoenix, Arizona, the sum of One Hundred Fifty Thousand Dollars ($150,000.00) to be used by said corporation for the erection, as soon as practicable, of a building to be situated in or near the City of Phoenix, Arizona, which said building shall be used by the said Sisters of Mercy of Arizona for the exclusive care of tubercular cases, and I direct that any tubercular patient is to be admitted and cared for in said building, irrespective of his or her religious belief or church affiliation.
The one of my Trustees who shall be acting at the time of the death of the survivor of my said wife and daughter, that is to say, Gus H. Hirschfeld, Sylvan C. Ganz or Phoenix Savings Bank and Trust Company, as the case may be, shall continue as sole Trustee to hold and manage the entire trust estate, including any and all accumulations and undistributed income, excepting, of course, the One Hundred Fifty Thousand Dollars ($150,000.00) to be paid to Sisters of Mercy of Arizona as aforesaid (excepting also the Five Thousand Dollars ($5,000.00) which might, under foregoing provisions, at that time be paid to Sarah J. Henderson), for a period of twenty-one (21) years from and after the death of the survivor of my said wife and daughter, and the net income therefrom shall be paid over and delivered by my said Trustee for and during said period of twenty-one (21) years and in quarterly installments, so nearly as that may be practicable, to said Sisters of Mercy of Arizona, to be used by said corporation to reduce the cost to individual patients who may be treated or cared for in the building to be erected by said Sisters of Mercy of Arizona as above provided.
I direct that there be filed in the Probate Court having jurisdiction of said trust, an agreement duly executed by said Sisters of Mercy of Arizona, wherein and whereby said corporation will agree to receive the net income from said trust estate for and during the period of twenty-one (21) years or such shorter period as may be limited by law, for the uses and purposes hereinabove provided, and if the said Sisters of Mercy of Arizona shall refuse or fail to execute and file such agreement within a reasonable time, then the entire estate shall immediately go and be paid over to my heirs-at-law then living, pursuant to the rules of succession of the State of Arizona then in force and effect.
Upon the expiration of twenty-one (21) years from and after the death of the survivor of my wife, Jo E. Craig, and my daughter, Kathleen Craig Bloomhardt, or upon the sooner termination of the trust, *232 if a termination of said trust should be required by law prior to the expiration of twenty-one (21) years, I direct that the entire trust estate shall go to and become the property of the Sisters of Mercy of Arizona, a corporation, absolutely, and subject to no direction by me or any other person. I express the hope, however, that said Sisters of Mercy of Arizona, shall make a use of the trust funds similar to the use to be made by said corporation of the income under the foregoing provisions.
The Sisters of Mercy of Arizona was a nonprofit charitable corporation that operated a charity hospital. It is now known as St. Joseph's Hospital and Medical Center. It continues as a non-profit charitable organization devoted to the care of the sick and needy.[1]
In 1944, the hospital filed a document agreeing "to receive the net income from the trust estate provided for under the Will of ROBERT WALLACE CRAIG, Deceased, Paragraph Fifth ...." In 1962, the hospital filed a second agreement to accept the trust "during the period of twenty-one (21) years or such shorter period as may be limited by law for the uses and purposes provided in the said Will." This document also stated: "The execution of this Agreement shall not preclude the undersigned from taking such action as may be necessary to secure a construction of the said Will in order to effectuate the intent and purpose of the testator."
The advent of public health measures and antibiotics have effectively reduced the incidence of tuberculosis in the general population. Between 1930 and 1986 the incidence of tuberculosis dropped from 130 cases per 100,000 population to 7 cases per 100,000 population. The treatment of tuberculosis has also changed. In Dr. Craig's day, treatment consisted of admission to a hospital. At the present time treatment is generally accomplished through chemotherapy on an out-patient basis. Hospitalization is generally no longer needed.
St. Joseph's filed a petition on December 14, 1988, proposing to the court that it depart from the terms of Dr. Craig's bequest under the cy pres doctrine. It submitted the affidavit of its vice-president for planning/research which asserted:
[I]t is not practical or feasible to construct a hospital facility for the exclusive care of tuberculosis patients for $150,000.00. Presently, the average capital expenditure to construct and equip one hospital bed in a major urban medical center is $150,000-$180,000. In contrast, renovating existing hospital space costs about $150-$180 per square foot, so $150,000 could renovate approximately 1,000 square feet of existing hospital space.
The hospital further stated that it was "unlikely that the annual cost of providing care to tuberculosis patients at St. Joseph's Hospital would approach $200,000 ...." In support of its request to use the bequest for purposes somewhat different from the specific terms of Dr. Craig's will, the hospital asserted:
There are a number of diseases related to tuberculosis. First, there are a variety of diseases  such as cancer or Acquired Immune Deficiency Syndrome (AIDS)  for which tuberculosis is a secondary illness caused by breakdowns of the immune system of the body. Second, there are a number of lung diseases other than tuberculosis  such as coccidimycosis (i.e., "Valley Fever"), chronic obstructive pulmonary disease, severe chronic asthma or emphysema  which can be broadly viewed to be related to tuberculosis.
The hospital requested the court to authorize the trustee to distribute the trust funds to it as follows:
(1) A lump sum distribution of One Hundred Fifty Thousand Dollars ($150,000), to be used by Petitioner to renovate and equip existing hospital space to be used for the diagnosis and treatment of patients with tuberculosis and related diseases.

*233 (2) For a period of twenty-one (21) years from May 16, 1987, until May 16, 2008, all of the trust income, to be used by Petitioner to provide care for patients with tuberculosis and related diseases where financial circumstances do not enable them to pay full charges.
The heirs-at-law (appellants/cross-appellees) intervened and objected to the hospital's petition. They filed a motion for summary judgment contending that the purpose of the trust had failed and that pursuant to the terms of the will, the entire trust estate should be immediately distributed to them. The trial court denied the hospital's petition and granted the heirs' motion for summary judgment. The hospital filed a motion for new trial, arguing that the judgment was contrary to law. The hospital asserted that the trust had not failed and the heirs were therefore not entitled to the trust estate. It also urged the court to apply equitable deviation to allow it to use the $150,000 bequest to build an out-patient facility for diagnosis and treatment of tuberculosis and to use the income to help defray the expenses of tuberculosis patients. The heirs moved to strike the motion for new trial, contending that it was an untimely attempt to introduce new evidence and legal theories. The heirs asked for an award of attorneys' fees as a sanction for the motion. After oral argument, the court granted the motion for new trial and reversed the summary judgment for the heirs. The court further "granted" the hospital's petition for a distribution of the trust assets, but denied any deviation from the terms of the will. The court also awarded the heirs limited attorneys' fees. The heirs' motion for new trial was denied. The heirs appealed and the hospital cross-appealed.
THE APPEAL
I. New Trial
The heirs argue that the trial court correctly granted their motion for summary judgment but committed error when it granted the hospital's motion for new trial. Summary judgment is appropriate only where the material facts are not in dispute and the inferences to be drawn therefrom lead to only one reasonable conclusion. Orme School v. Reeves, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). A party may properly file a motion for new trial to challenge summary judgment granted to the opposition. Maganas v. Northroup, 112 Ariz. 46, 537 P.2d 595 (1975). In reviewing an order granting a new trial, "we will uphold the order unless the trial court clearly abused its discretion." Tempe Corporate Office Building v. Arizona Funding Services, Inc., 167 Ariz. 394, 398, 807 P.2d 1130, 1134 (App. 1991).
A. Resulting Trust
The basic premise of the heirs' position is that the purpose of Dr. Craig's trust has failed, thus the hospital can no longer receive the gift and it should be paid to them, either under the so-called "gift-over" provision of the will, or under a resulting trust in favor of Dr. Craig's estate. According to the Restatement (Second) of Trusts § 413 (1959) when the purposes of a charitable trust cannot be accomplished, the transferee holds the property in a resulting trust for the transferor or his estate. No resulting trust arises if cy pres is applicable or the transferor intended no resulting trust. Id.
We must determine Dr. Craig's dominant purpose in establishing this trust. See In re Conness' Estate, 73 Ariz. 216, 240 P.2d 176 (1952). Once we have determined his purpose, we liberally construe his language in order to carry out his purpose. Id.
In his will Dr. Craig directed that upon the death of the survivor of his wife and daughter, the hospital take $150,000 of the trust estate to erect a building in or near Phoenix "for the exclusive care of tubercular cases." Next, he directed that the trust continue in place for a period of 21 years, with the income therefrom paid to the hospital "to be used by said corporation to reduce the cost to individual patients who may be treated or cared for in the building to be erected ... as above provided." After the expiration of the trust, Dr. Craig *234 gave the entire estate to the hospital "absolutely, and subject to no direction by me or any other person." The estate today has a value of over $3,000,000 and generates an annual income of more than $200,000.
No question is raised as to whether the hospital could have followed the trust instructions to the letter at the time of Dr. Craig's death. However, Dr. Craig's wife and daughter lived a long time after his death and conditions changed. The incidence of tuberculosis has greatly diminished and the methods of treating it have undergone a revolution. Additionally, the cost of construction of a hospital has risen so dramatically that the $150,000 legacy today would merely cover the cost of constructing and equipping one hospital bed.
The combination of changes presents us with a paradox. The size of the bequest for the capital outlay for Dr. Craig's building is now dwarfed by the size of the bequest whose purpose was to defray the expenses of its patients. However, it appears that the building envisioned by Dr. Craig is no longer necessary or financially feasible and would be a waste of resources.
While the incidence of tuberculosis has dramatically decreased, and the methods of treating it have changed substantially, the basic need for tending to people suffering from tuberculosis has not changed. Contrary to the assertion the heirs make in their briefs, tuberculosis is not merely a problem of the past. The evidence the hospital presented on this point is not in dispute: tuberculosis remains a serious health problem.
The heirs argue that the purpose behind Dr. Craig's trust has failed. We think their argument takes too narrow a view of what Dr. Craig was seeking to accomplish. The erection of a building was not Dr. Craig's charitable intent; the care of tuberculosis patients was. Consequently, the purpose behind Dr. Craig's charitable trust remains intact. The changed circumstances relate to the other end of the problem: how to administer Dr. Craig's trust estate to accomplish the goal. The charitable trust has not failed. There is no resulting trust in the heirs.
B. "Gift-Over" Provision
The heirs also argue that the hospital has forfeited the trust because it allegedly did not comply with his requirement to file an acceptance of the gift. The specific provision in question reads:
I direct that there be filed in the Probate Court .. . an agreement duly executed by [the hospital] wherein and whereby said corporation will agree to receive the net income from said trust estate for and during the period of twenty-one (21) years or such shorter period as may be limited by law, for the uses and purposes hereinabove provided, and if the [hospital] shall refuse or fail to execute and file such agreement within a reasonable time, then the entire estate shall immediately go and be paid over to my heirs-at-law then living, pursuant to the rules of succession of the State of Arizona then in force and effect.
The heirs concentrate on the phrase "within a reasonable time." Conceding that the hospital has filed two documents purporting to comply with Dr. Craig's requirement, they argue that Dr. Craig intended that the acceptance be filed after the death of the survivor of his wife and daughter.
We disagree with the heirs' interpretation of this provision. Dr. Craig gave no time period to which the "reasonable time" referred. His evident purpose was to secure a pledge that the hospital would carry out his wishes to treat persons suffering from tuberculosis.
Even if we were to accept the heirs' contention that the will could only mean "within a reasonable time" of the death of the survivor, the prior filing of the agreement would not violate this provision. "Within a reasonable time" can refer to time both before and after the event in question. If Dr. Craig had wanted the agreement filed after the death of the survivor, he could have easily said so. As it stands, the fact that the agreement was already on file at the time when it became necessary clearly comports with the intent *235 behind its requirement.[2]
We also agree with the hospital that its petition seeking to apply cy pres to depart from the explicit terms of the trust did not constitute a repudiation of the gift. No words found in the petition could reasonably be construed as a repudiation. Furthermore, the mere fact that a party seeks to construe the will to determine how it may deal with the bequest does not constitute a rejection of the gift. Cf. Ivancovich v. Meier, 122 Ariz. 346, 352, 595 P.2d 24, 30 (1979) (petitioner whose suit sought to determine meaning of testator's will did not forfeit will rights under in terrorem clause forfeiting the gift of any devisee who challenged the will).
II. Setting Aside Summary Judgment
Given that the trust purpose had not failed and the hospital had fulfilled the requirement that it file a written acceptance of the bequest, the trust estate was not payable to the heirs either under a resulting trust or the "gift-over" clause. Consequently, the summary judgment the trial court granted to the heirs was erroneous when made. Had the hospital immediately filed a notice of appeal instead of its motion for new trial, it would have been this court instead of the trial court which reversed the summary judgment. The trial court therefore did not abuse its discretion in granting the hospital's motion for new trial and in setting aside the summary judgment. We need not address the heirs' contentions regarding new evidence and new legal theories.
CROSS APPEAL
The hospital argues in its cross appeal that the court erred in refusing to allow it to depart from the terms of the trust, either through cy pres or equitable deviation.
I. CY PRES
At the present time, cy pres has not been adopted in Arizona. See State ex rel. Goddard v. Coerver, 100 Ariz. 135, 144, 412 P.2d 259, 265 (1966); In re Hayward's Estate, 65 Ariz. 228, 235, 178 P.2d 547, 551 (1947). Whether or not cy pres is to be the law of this state is not a question we must decide here. We believe this is a compelling case for the application of equitable deviation.
II. Equitable Deviation
Like cy pres, "equitable deviation" allows a departure from the express terms of the trust:
The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust.
Restatement (Second) of Trusts § 381 (1959). "[I]f necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust." Id., comment d.
Deviation and cy pres, while they are similar and seek to promote similar purposes, are distinguishable:
The defendant has raised the point that no deviation is possible since the cy pres doctrine is not recognized in South Carolina. It is the opinion of this Court, however, that the cy pres doctrine has no application in the instant case in any event as there is here no diversion of the trust and no transfer of assets to a different charity or to a different purpose.
* * * * * *
If anything, there is only a deviation from the strict or technical terms of the trust to enable the same charitable institution to better fulfill the purposes for which it was organized and to carry out to the fullest extent possible, the intent and purposes of the grantors of the property in question.
*236 State ex rel. Goddard v. Coerver, 100 Ariz. 135, 144, 412 P.2d 259, 265 (1966), quoting Furman University v. McLeod, 238 S.C. 475, 120 S.E.2d 865, 873 (1961). One court has stated:
In ordering a deviation a court of equity is merely exercising its general power over the administration of trusts; it is an essential element of equity jurisdiction. In ordering a deviation the court does not touch the question of the purpose or object of the trust, nor vary the class of beneficiaries, nor divert the fund from the charitable purpose designated .... The jurisdiction merely to vary the details of the administration of a trust is more liberally exercised, more firmly established and more widely recognized than the cy pres power of the court.
Craft v. Shroyer, 81 Ohio App. 253, 74 N.E.2d 589, 598 (1947) (citations omitted). Equitable deviation allows "a small change incident to the method of administration, which does not alter the purpose or object of the trust, nor vary the class of beneficiaries,[3] nor divert the fund from the charitable purposes named by the donor." Id.
In applying equitable deviation, we must determine Dr. Craig's basic purpose in establishing the trust, and what he would now direct in view of the changed conditions resulting from the passage of time. See Cleveland Museum of Art v. O'Neill, 72 Ohio L.Abs. 11, 129 N.E.2d 669, 670 (Ohio Com.Pleas 1955). We have already concluded that his basic purpose was to help persons suffering from tuberculosis. To determine if, and to what extent, deviation should apply, we examine its application in other cases.
In Cleveland Museum of Art v. O'Neill, several persons had established trusts for the acquisition of pieces of art for the art museum. Over the years the museum had been so successful in acquiring pieces that it no longer had the space to adequately display them. The museum therefore sought to use the income from the trusts to add on to its physical facilities. The court agreed that this was a proper application of equitable deviation.
Those who created the trusts with which this action deals were among the pioneers in the movement to bring into being a truly great Art Museum. The evidence is clear that in their day the most practical way for accomplishing their expansive purpose was to set aside funds for the acquiring of objects of art. That was the primary goal on the way toward establishing a strong Museum; they did their share in realizing it by making money immediately available for much-needed purchases.
.....
It is clear that there is no failure of the purpose which the settlors made manifest in their respective trusts .... But circumstances beyond the vision of the settlors today threaten to defeat the accomplishment of the very purpose which they had in mind. Lack of space now means loss of pictures for public enjoyment .... The evidence indicates that the need has changed, but that the longrange purpose remains the same, namely, the maintenance of an outstanding Museum of Art.
The Court is entitled to ask what the settlors would do today with the income of their trust funds, in view of the changed conditions that they could not anticipate. Would they be inclined to see the broad work of The Cleveland Museum of Art either defeated or impaired by lack of space? From the evidence the Court is convinced that the settlors were persons of broad vision and that in any event they would want the Museum to prosper, to expand and to be able to carry on its work indefinitely. The Court has no hesitancy in saying that under existing circumstances they would willingly deviate from their expressed method of procedure and permit the income from the trusts to be used as prayed for in the petition.
Id. at 671. The court therefore applied § 381 of the Restatement (Second) of *237 Trusts to allow the income from the trusts to be used for remodelling and adding to the existing museum building. Id. at 672.
In Colin McK. Grant Home v. Medlock, 292 S.C. 466, 349 S.E.2d 655 (App. 1986), the settlor left the residue of his estate to the "Colin McK. Grant Home" which he directed be built on the southwest corner of Huger and Meeting Streets. He directed that the home be
for white persons in reduced circumstances, both men and women, who by faith and profession are Presbyterians .... Provided that ... such persons shall be over forty years of age and shall have been residents of the City of Charleston for at least five years.
Id. 349 S.E.2d at 656-657. The court of appeals agreed with the trial court that the intent behind the trust was "to provide housing for elderly Charleston Presbyterians of reduced circumstances." Id. at 659. It rejected the heirs' contentions that the purpose was specifically to establish a monument to Colin McK. Grant at the specified location and to benefit only Caucasians. The court held that changed circumstances warranted a deviation from the express terms of the trust. The neighborhood surrounding the specified location had changed, rendering it unsuitable for such a residence. Id. Furthermore, race relations had advanced to the point that segregation was no longer the practice. Id. The court of appeals therefore upheld the trial court's order removing the racial restriction and the requirement that the housing be at the specific location.
The South Carolina court's discussion of changed circumstances is apt here:
There is no reason to doubt that if that particular real estate should become unsuitable for this purpose, [the settlors] would have wished the funds to be used to provide some other means of housing for the intended beneficiaries of the trust. Thus, the use of the specific Home they established was merely one method, convenient at the time of the trust's establishment, for carrying out their intent.
Id. at 658 (emphasis added). Like the placing of the Colin McK. Grant home at a specified location, the erection of a building for housing tubercular cases "was merely one method, convenient at the time of the trust's establishment, for carrying out [Dr. Craig's] intent." The changed circumstances require us to determine, as best we can from the will and its surrounding circumstances, how Dr. Craig would have directed the administration of the trust to best effectuate his purpose. See id. See also Restatement (Second) of Trusts § 167, comment a and illustrations 3, 5, 8 and 9.
In State ex rel. Goddard v. Coerver, 100 Ariz. 135, 412 P.2d 259, the Territory of Arizona had deeded land to the trustees of the mental hospital to be used in connection with that hospital. The hospital long used the land for agriculture, both as a means of supporting the hospital and as a method of treating patients. Due to changed circumstances, including a change in economics and the fact that "[r]ehabilitative theories no longer support such activities as the most effective means of treatment of the mentally ill," the supreme court applied equitable deviation and held that the hospital board could sell a portion of the land to Maricopa County if the county used the land to build a county hospital which would treat the mentally ill. Id. at 145, 412 P.2d at 265.
In our case, it is undisputed that the change in circumstances between 1933 and the present has made the construction of a separate building unfeasible, uneconomical and wasteful. We hold that its construction "would substantially impair the accomplishment of the purposes of the trust" Dr. Craig established in his will. See Restatement (Second) of Trusts § 381 (1959). An alternative use of this portion of the bequest would better serve Dr. Craig's generous intent. The trial court erred in requiring the needless construction of the building. It should have allowed the hospital to use the $150,000 to renovate and equip existing facilities to be used for the treatment of patients with tuberculosis.
It was clearly Dr. Craig's intent to help relieve the financial burden of persons *238 suffering tuberculosis who were treated by the hospital. He directed that the building be used "for the exclusive care of tubercular cases" and that the trust income be used "to reduce the cost to individual patients who may be treated or cared for in the building ...." The hospital sought to apply cy pres to use the income not only for tuberculosis treatment, but also for the treatment of persons with such conditions as AIDS and cancer, diseases whose suppression of the immune system can bring on tuberculosis as a "secondary illness." We do not believe that any divergence from the terms of the will is necessary to use the trust income for those people.
We here construe the term "tubercular cases." It is evident that this term means those patients suffering from tuberculosis. The language of Dr. Craig's will does not direct that the trust be used to treat only tuberculosis: it seeks to help the financial condition of "tubercular cases" and "individual patients." It must have been within Dr. Craig's contemplation that a person confined to a tuberculosis sanatorium might have other health problems. His will does not limit his charity to the treatment of the specific disease: it goes to the whole patient. Consequently, no deviation from Dr. Craig's will is necessary to allow the hospital to use the trust income to defray all the health care expenses for its tuberculosis patients.
St. Joseph's petition also asked to utilize the trust funds for treatment of persons with "related illnesses" who are not suffering from tuberculosis. To allow the hospital to use Dr. Craig's trust to help persons not suffering from tuberculosis, but related illnesses, would require a greater departure from the terms of the trust than appears necessary on the present facts.
"Although a court has considerable discretion to adapt a trust to changed circumstances, this flexibility is not unlimited. The distribution of trust property must always be in accord with the settlor's intent." Colin McK. Grant Home v. Medlock, 292 S.C. 466, 394 S.E.2d 655, 658. We take this as an admonition to caution. We deem it best to vary as little as necessary from the express terms of the trust. Dr. Craig's beneficence was aimed at tubercular cases and it does not appear on the record that there is a present need to go beyond that. Thus, on this record, we will not allow the hospital to use the funds on patients suffering related illnesses if they are not also tubercular cases.
III. Attorneys' Fees
In their motion to strike, the heirs requested an award of attorneys' fees as a sanction for the filing of the hospital's motion for new trial. They cited Ariz. Rev. Stat. Ann. ("A.R.S.") § 12-349, and Ariz. R.Civ.P. 11 and 59. The trial court awarded the heirs attorneys' fees for the period between August 11 and October 8, 1989.[4] Sanctions can be awarded under these circumstances:
A. Except as otherwise provided by and not inconsistent with another statute, in any civil action commenced or appealed in a court of record in this state, the court shall assess reasonable attorney fees, expenses and, at the court's discretion, double damages of not to exceed five thousand dollars against an attorney or party ... if the attorney or party does any of the following:
1. Brings or defends a claim without substantial justification.
2. Brings or defends a claim solely or primarily for delay or harassment.
3. Unreasonably expands or delays the proceeding.
4. Engages in abuse of discovery.
A.R.S. § 12-349. The trial court did not make any findings nor give any explanation for its award of fees. Its award cannot be upheld under A.R.S. § 12-349 as that requires the court to set forth the specific reasons behind its award. A.R.S. § 12-350.
A party or attorney may be sanctioned for violating the following requirement of Rule 11:

*239 The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
The facts regarding the hospital's actions in this suit are not in dispute. We therefore review de novo the conclusion that its actions constituted a violation of the rule. Gilbert v. Board of Medical Examiners of State of Arizona, 155 Ariz. 169, 184, 745 P.2d 617, 632 (App. 1987). There is no evidence in the record to indicate that any of the hospital's filings were done for an improper purpose. As we have ruled today, its claim was not groundless. Therefore, no Rule 11 sanctions were available.
Finally, there is nothing in Rule 59 which would give the court the power to impose sanctions. Courts should not impose sanctions lightly. Johnson v. Brimlow, 164 Ariz. 218, 222, 791 P.2d 1101, 1105 (App. 1990). The award of attorneys' fees must be reversed.
CONCLUSION
The dominant purpose behind Dr. Craig's trust was to use his wealth to help people suffering from tuberculosis. The agreements the hospital filed accepting his bequest satisfied the requirement set forth in his will. The trial court therefore correctly overturned the summary judgment previously entered in favor of the heirs.
Given the change in circumstances, a deviation from the express terms of the trust is appropriate to carry out Dr. Craig's intentions. The hospital should be allowed to use the $150,000 to upgrade existing facilities to better diagnose and treat tuberculosis. The trust income can be used to help treat all illnesses and conditions of the hospital's tubercular cases. The court's orders inconsistent with these holdings were in error.
The court also erred in awarding attorneys' fees against the hospital.
The judgment is affirmed in part and reversed in part. The cause is remanded to the superior court for further proceedings not inconsistent with this opinion.
EUBANK and GARBARINO, JJ., concur.
NOTES
[1] In this opinion, we will refer to the petitioner as either St. Joseph's or the hospital.
[2] Cf. Barassi v. Matison, 130 Ariz. 418, 636 P.2d 1200 (1981) (premature notice of appeal did not preclude appellate jurisdiction; purpose behind time requirements is still served even when notice is filed too early).
[3] But see Colin McK. Grant Home v. Medlock, 292 S.C. 466, 349 S.E.2d 655, 660 (App. 1986) (class of beneficiaries may be expanded under equitable deviation).
[4] The heirs filed their response to the hospital's objection to form of judgment on August 11, 1989. The hospital filed its motion for new trial on October 8.